Commonwealth *v.* Chirico et al., Appellants.

Argued October 31, 1934.

Before TREXLER, P. J., KELLER, CUNNINGHAM, BALDRIGE, STADTFELD and PARKER, JJ.

*Henry M. Stevenson,* for appellants.

*Earl J. Gratz,* and with him *John A. Boyle,* Assistant District Attorney, for appellee, filed no brief.

OPINION BY CUNNINGHAM, J., March 13, 1935:

The above entitled twenty-six appeals—Nos. 482 to 507 of October Term, 1934, of this court—were consolidated for argument and may be disposed of in a single opinion.

The five appellants, Angelo Chirico, Julius Berg, James Amato, James Tendler and Rocco Di Nubile, were convicted and severally sentenced to imprisonment for two years under an indictment found at No. 826, June Sessions, 1934, of the court below, charging them with having conspired amongst themselves and with other unnamed persons on April 20, 1934, "to unlawfully and publicly erect, set up, open, draw and make a certain lottery for moneys, goods, wares and merchandise," contrary etc.

Angelo Chirico, one of appellants, was also convicted under an indictment found at No. 814, June Sessions, 1934, charging him in seven counts with various phases of the crime of erecting, setting up, opening, making and drawing on May 1, 1934, a lottery for moneys, etc., and with selling lottery tickets and policies. The indictment was drawn substantially in

the language of Sections 52, 53 and 54 of the Penal Code of March 31, 1860, P. L. 382, and he was sentenced under this indictment to imprisonment for one year, to begin at the expiration of his sentence at No. 826, June Sessions, 1934, for conspiracy.

The other four appellants, Berg, Amato, Tendler and Di Nubile were convicted under five separate indictments, each containing seven counts, of having erected, set up, opened, made and drawn lotteries and with having sold lottery tickets on the five hereinafter mentioned dates—each of said indictments specifying a different date. The indictment found at No. 818, June Sessions, 1934, fixed April 20, 1934, as the date upon which the offenses, therein charged, were committed; the indictment at No. 819, June Sessions, 1934, charged the offenses as having been committed on April 23d of that year; the one at No. 816, June Sessions, 1934, specified the date as April 24th; the bill at No. 820, June Sessions, 1934, fixed the date as April 28th; and the indictment at No. 817, June Sessions, 1934, specified April 30th as the date of the commission of the offenses therein charged. Each of these four appellants was sentenced to imprisonment for five consecutive terms of one year, to follow their sentences for conspiracy at No. 826, June Sessions, 1934,—making a total term of three years for Chirico, and seven years for each of the other four appellants.

Summarizing the proceedings, it may be said that all the appellants were convicted and sentenced for having conspired on April 20, 1934, to erect, set up, open, draw and make a lottery; four of them, Berg, Amato, Tendler and Di Nubile were convicted of having, as separate offenses, erected, set up, opened, made and drawn lotteries on April 20, 23, 24, 28, and 30, 1934; and Chirico was convicted and sentenced for having erected, set up, opened, made and drawn a lottery on May 1st of that year. We now have before

us for disposition separate appeals by each appellant from each of the sentences referred to above.

It may be observed at this point that in addition to the lottery bill against Chirico at No. 814, June Sessions, 1934, there were nine other indictments charging him with conducting a lottery on dates other than the date laid in the bill at No. 814; there were also five other indictments against Berg, Amato, Tendler, and Di Nubile, charging them with conducting lotteries on dates other than those specified in the five bills referred to in the caption of this opinion. By their verdict the jurors convicted Chirico on three indictments and convicted Berg, Amato, Tendler and Di Nubile on all of the indictments against them. Sentence was suspended, however, upon all indictments except the seven specifically referred to herein.

The assignments of error, within the scope of the statement of questions involved, relate to (a) The refusal of the trial judge to quash the indictments; (b) The sustaining of the Commonwealth's demurrer to pleas of autrefois convict entered by appellants to all the indictments, except the one charging conspiracy; (c) The admissibility of certain testimony and the sufficiency of the evidence, as a whole, to sustain the convictions; and (d) Alleged errors in the charge.

As a preliminary and historical matter, it may be stated that at Nos. 386, 394 and 407 of May Sessions, 1934, of the court below, the appellants, and another defendant (Ralph De Maria), had been indicted upon the charge of erecting, setting up, opening, drawing and making a lottery on May 2, 1934. When called for trial upon those indictments on June 14, 1934, each of them entered a plea of guilty to the charges contained in the bills then before the trial court. After the testimony of a police officer had been taken for the information of the trial judge, counsel for appel-

lants requested that the imposition of sentences be deferred. The learned trial judge, GORDON, JR., J., announced he would defer sentence for the present, and, after commenting upon the fact that the evidence indicated appellants were connected with the management of a "bank" taking in as high as $50,000 a week and after referring to the fact that the pleas then before the court were to only a single offense, gave the following instructions to the district attorney: "Mr. District Attorney, the evidence in this case discloses that there was a daily play here for a number of weeks; and I instruct you to prepare district attorney's bills against each one of these men for each day shown by these records, and send them in to the grand jury. . . . . . . ."

Each of the seven bills, under which sentences were pronounced, bore the following indorsement on the outside thereof: "And now, to wit, June 18, 1934, leave is granted the district attorney to present the within bill of indictment against the above defendants to the grand jury as a district attorney's bill, G. Jr., J."

When the cases here involved were called for trial on June 27, 1934, motions were made to quash each indictment. The only grounds urged in support of the motions to quash the several bills (other than the one charging conspiracy) which require consideration were that they were submitted to the grand jury without a previous information, preliminary hearing, or opportunity on the part of appellants to examine witnesses at such hearing; that no petition was filed by the district attorney for leave to present them, nor was any "emergency or compelling reason or any public necessity" for their presentation averred or shown; and that the subject matter thereof had not been previously given in charge of the grand jury by the court below. It was also asserted that the indorsement of

the above quoted leave of court upon the bills was prejudicial to the rights of appellants. An additional reason urged in support of the motion to quash the conspiracy indictment was that it did not charge the offense with sufficient certainty of description.

We think the trial judge was entirely justified in refusing the motions to quash. The presentation of a district attorney's bill by permission or direction of the court is one of the recognized methods of having a criminal charge presented to a grand jury for its investigation and action. From what we have already said, it is apparent that these indictments were found by the grand jury pursuant to one of the well established methods prevailing in this Commonwealth: Com. v. Green, 126 Pa. 531, 17 A. 878.

As to the conspiracy indictment, it may be observed that by Section 52 of the Penal Code, supra, all lotteries are expressly declared to be common nuisances, and by the 53d section it is provided that any person who shall publicly or privately erect, set up, open, make or draw any lottery, etc., shall be guilty of a misdemeanor and punished as therein provided. The conspiracy indictment charges a conspiracy to commit the misdemeanor thus defined by the legislature and there is no merit in the contention that the offense is not sufficiently described therein.

The sole basis for the pleas of former conviction, entered to the six lottery indictments, was the fact that appellants, as above stated, had previously, namely on June 14, 1934, entered pleas of guilty to indictments charging them with having committed, on May 2d of that year, the same kind of misdemeanors as those charged in the bills to which they were then called upon to plead. None of them, however, had been sentenced upon his plea of guilty. All of the district attorney's bills charged the commission of the offenses therein described upon dates prior to May 2d.

The trial judge sustained the Commonwealth's demurrer upon the following grounds: (a) Because the indictments at the May Sessions, to which the pleas of guilty had been entered, charged the commission merely of additional crimes; and (b) Because the records of the cases at the May Sessions disclosed there had been no conviction of the defendants in those bills of indictment—no judgment having been entered on the pleas of guilty. Thereupon, appellants entered pleas of not guilty to each of the above mentioned six lottery indictments and to the conspiracy bill.

The form of lottery charged to have been conducted by appellants is commonly known, and referred to throughout the testimony, as the "numbers game."

In Com. v. Banks, 98 Pa. Superior Ct. 432, this court decided that the setting up and conducting of this game is a violation of the provisions of our Penal Code, supra, prohibiting the setting up of lotteries for money, etc., and the selling of lottery tickets.

Before proceeding to a consideration of the disposition of the pleas of former conviction and of the sufficiency of the evidence, it is essential that an understanding be had of the method of operating the game of chance with which we are here concerned.

In the Banks case we said:

"The scheme used by the appellant is familiarly known as the 'number game.' In addition to the 'player,' it employs a 'banker' or 'backer,' a 'writer,' and sometimes a 'pick-up man.' The player selects a number of three figures and plays an amount of money upon it which he pays to the writer. The writer has a book containing slips in triplicate with carbon sheets between. He writes the number selected by the player in the book, gives the white copy to the player, the yellow copy to the backer and retains the tissue copy in the book. If a pick-up man is employed he gathers the yellow slips or tickets from the various

writers and delivers them to the backer. The winning number is determined next morning by reference to the published statement of the New York Clearing House, with respect to exchanges and balances. These are published every morning in the daily papers in figures of even millions and the last two figures of the exchanges with the last figure of the balances constitute the winning number. For example if the clearing house statement shows exchanges of 547 millions, and balances of 105 millions, the winning number is 475; if exchanges of 673 millions and balances of 119 millions, the winning number is 739. The outcome is wholly a matter of chance. Skill has no place in it. If the player wins he gets from the backer 600 times the amount he played; if he loses he gets nothing; play can be made for any amount from one cent up."

Although written in 1930, that description of the game is applicable today, with the exception that, as disclosed by the evidence in this case, a new method of determining the winning number has been devised. While upon the stand, Sergeant Ellis of the Philadelphia Police Bureau testified that the winning number is now "taken from the totals of the first three races at some designated horse-race track, each day." In further explanation, he said: "A. When I say that, I mean that they take the first three winners at these tracks. In other words, the horses which come in first, second, and third, and by learning the odds they paid on the first, second, and third, each of the first three races, and adding up those totals for each race, they get a certain total; and then they select a number, the third number from the right, from top to bottom, and that number is the number by which they determine who the winner shall be in the lottery numbers for a particular day. Q. You mean the odds on the first three horses placed in the races are added together? A. What they pay, yes. Q. They are added together?

A. In other words, say one horse paid 120, another 50, and another 40—they would be added together. Q. That would be 210? A. Yes. Q. What would the number be used in the lottery? A. They would go by the same method in the next race, and on into the third race; then taking the figures and using the third numbers from the right, from top to bottom. The third figures from the right make the winning number."

Another variation in methods is the issuing of "rate-cards," showing upon what numbers bets had been reduced; in other words, the numbers which are so heavily played that in order to protect themselves the bankers have found it necessary to reduce the odds from the customary 500 to 1 to 300 to 1.

It is apparent from what has been said that each lottery here charged could have been (and under the evidence was) set up, opened, made and drawn within a period of twenty-four hours. That is, the players laid their wagers, by selecting their numbers and paying their money, during the morning and afternoon of a given day; the yellow copies of the slips and the money were delivered to the bankers that afternoon or evening; the winning number was determined the next morning by inspection of the racing news of the previous day. That particular lottery was ended and its results known to every player within twenty-four hours after his bet was made.

It seems quite clear that each person connected with the receiving of the bets, bringing them into the bank, ascertaining the winners and distributing the money, would be guilty of a distinct and completed violation of the statute each time this process was carried through.

Aside, therefore, from the operation of the general rule that in order to support the plea of former conviction the record pleaded should show that judgment has been pronounced upon the former verdict or plea

of guilty, we think the court below was correct in holding that the indictments at the June Sessions, which were then before the court for trial, charged offenses which were so entirely separate and distinct from those charged in the indictments at the May Sessions that, even if sentences had been imposed under the latter, the record thereof would not have furnished a sufficient support for the pleas of former conviction: Com. v. Brown, 28 Pa. Superior Ct. 296; Com. v. Hazlett, 14 Pa. Superior Ct. 352. There is, therefore, no occasion for us now to consider when it is, and when it is not, necessary to have a judgment or sentence of a court pronounced in order to establish a "conviction."

This brings us to a consideration of the sufficiency of the evidence at the trial of the present indictments to support the several convictions which were followed by the sentences from which these appeals were taken.

No testimony was offered by, or on behalf of, the appellants. From the uncontroverted testimony for the Commonwealth, these material facts appear: About three o'clock on the afternoon of May 2, 1934, Sergeant Ellis and other officers raided the three story building at No. 1010 South 9th Street and arrested the appellants in a room on the third floor, where a numbers bank was in operation. The first floor of the building was occupied by a bakery, and the second as a dwelling; a concealed electric buzzer transmitted signals from the first to the third floor. Included in the paraphernalia seized in the room in which appellants were engaged at the time "in checking up records of the lottery on tape, and tabulating number slips" were 13,939 lottery slips or tickets; 24 check-up sheets; 43 adding machine check-up tapes; 350 lottery rate cards; a book containing 92 record sheets; 502 record sheets in bulk; and four Victor, one Remington and one Barrett, adding machines. Two telephones were also installed in the room.

Chirico stated to Ellis that he had been employed in the bank "for a few days"—the lottery indictment upon which he was sentenced specified the date of May 1st. Berg, Amato, Tendler and Di Nubile, severally admitted they had been engaged in various capacities in the bank "for two weeks." Tabulations made from the data seized at the time of the raid show that the amounts of the bets placed between April 9th and April 14th aggregated $46,384, and between April 16th and 21st inclusive, $48,116.

We are not persuaded that the learned trial judge erred in any of his rulings upon the admission or rejection of evidence; nor do we find anything in the charge concerning which the appellants have just cause to complain. In the light of their admissions that they had participated in the transactions carried on in that room upon the dates laid in the indictments against each of them, the vital question of fact was whether they had assisted in conducting a separate lottery upon each of those dates.

That question was fairly and adequately submitted to the jury in this language:

"The first officer on the stand, Sergeant Ellis, tells you that customarily, as I understand his evidence,— and if I misunderstood him, the matter is entirely for you—he tells you that this lottery playing is customarily done on separate and distinct days. Each one is a separate and distinct lottery. In other words, a number, by a certain system connected with horse racing—you will recall what it is; I do not recall it in detail—is ascertained as the 'controlling' or winning number; and when these lottery slips are sold, they are sold for a number that comes that particular day. For each day there is a separate selling for separate numbers. That I understand to be the effect, at least, of his testimony. If that is true, and you believe it beyond a reasonable doubt—if you believe

from these records, with the testimony and the admissions of the defendants, that they were engaged on these ten days at this place in setting up and maintaining a lottery each day, you would be justified in convicting them. If, however, you have an honest reasonable doubt on the subject, you will acquit them. Or, if you believe they were not so engaged, you should acquit them.

"One may set up a lottery, and may sell the tickets for it over a long period of time. We know of a great many lotteries that are held from time to time, for which tickets are sold maybe a month in advance; sometimes for charitable or other purposes, although they are illegal. But criminal lotteries are held and tickets are sold by the persons interested in such an enterprise over a long period of time; sometimes for a week, sometimes for a month; but there is only one lottery; there is one drawing, or one system and one determination of a controlling number; and the distribution of the prizes, in money or otherwise, whenever it is, is a single distribution. A man might have one such lottery a month for twelve months and he would then be holding twelve distinct lotteries. If he had twelve separate lotteries a year, he would be guilty of twelve offenses. If, however, over a period of a year he sells tickets and they are only for one lottery, he would only be guilty of one offense. Therefore one may be guilty of the offense of setting up a lottery and maintaining and operating it every day and if it is a fact that he did maintain and operate a separate lottery each day, then he could be indicted, and would be liable to the penalties under the statute for setting up and maintaining a lottery for each day that he did set up and maintain a separate lottery. It is a matter of no importance, in the ultimate conclusion, that one holds separate lotteries but keeps his records in one place, if it is shown by records and circumstances in

the possession of a person that he was operating a separate lottery each day; and if all the evidence satisfies the jury beyond a reasonable doubt that he was, then the jury may convict on the bill of indictment, if it is found and presented to them, for each separate lottery that is set up. ........ If there was only one lottery with one single drawing, then you will acquit these defendants on these bills of indictment; but if there is anything to indicate and satisfy you beyond a reasonable doubt that there was a separate lottery on each of those ten days I am referring to, then you may convict them on such bills covering the dates you find there was a separate lottery, if you believe from the evidence that these defendants were parties to the setting up and maintaining of lotteries at that place on those dates.''

Upon a review of the entire record, we are satisfied that, from the oral testimony and the contents of the records and memoranda seized at the time of the arrest, a jury could reasonably find that a separate and distinct lottery was conducted by appellants on April 20th, 23d, 24th, 28th and 30th, and on May 1, 1934,—the dates laid in the indictments here involved.

Appellants had a fair trial and, in our opinion, the verdicts were fully warranted by the uncontradicted and unexplained evidence. If the sentences seem unusually severe one reason appearing upon the face of the record is that, although repeatedly afforded an opportunity to do so, each appellant refused to name the persons by whom he had been employed. Having deliberately chosen to obey the code of the underworld rather than the penal code of their state, they are not entitled to complain of the manner in which the trial judge exercised the discretion vested in him by law.

The judgments from which the above captioned appeals were taken are severally affirmed.