Commonwealth v. Townsend et al., Appellants.

338

Argued April 13, 1942.

Before
KELLER, P. J., CUNNINGHAM, BALDRIGE, STADTFELD, HIRT and KENWORTHEY, JJ.

*Maceo W. Hubbard,* with him *Raymond Pace Alexander,* for appellants.

*Frederick B. Smillie,* District Attorney, for appellee.

OPINION BY KELLER, P. J., July 23, 1942:

The defendants, Charles Townsend and Flossie Townsend, his wife, were convicted of the larceny by trick, of $122 from Ida Lee Butler. From the respective sentences imposed upon them they have appealed to this court.

The particular trick, by which Mrs. Butler's money was taken from her, is known in underworld lingo as 'flim-flam' or 'drop-pigeon'[1]—a form of 'bunco' or 'confidence game'. It was described by Mrs. Butler roughly as follows:

While shopping in a store market on June 9, 1941, around 12:30 P.M. she was engaged in conversation by a woman, whom she had never seen before, but whom she identified as the woman defendant, Flossie Townsend. This woman followed her outside the store, and while she (Mrs. Butler) was waiting for a bus, said, "Look! Did you see that man pick up a pocket book?" Mrs. Butler looked and saw a strange man—whom she identified as Charles Townsend. The man came over and they got talking about the pocket book that he had found, and its contents, which, he said, consisted of money and bonds, and which he offered to divide with the two women, if his 'boss' said it was all right. After going away to consult his boss, he came back and reported that it would be all right to divide it three ways, and that Mrs. Butler's share was about $500, but that before getting it, she would have to be 'identified' as a responsible person having that amount of money. Thereupon, they learned from Mrs. Butler that she had $22 at home and $100 in bank, which, in company with Mrs. Townsend, she drew out for 'identification' purposes. They then met Charles Townsend again, who got the money from Mrs. Butler to show to his boss,

---

[1] The word 'pigeon' is used in the sense of 'gull' or 'dupe' [Webster]; "To gull, cheat, delude, swindle, etc." [Shorter Oxford].

to see if it would be all right, leaving the two women together. After waiting a while the strange woman went away to find out where Townsend was, leaving her bag, containing the pocket book, with Mrs. Butler to hold until she came back. Of course, neither of them came back, and on opening the Townsend woman's bag nothing of value was in it, and the birds had flown. They were subsequently arrested in Philadelphia and identified by Mrs. Butler; and the woman was also identified by a policeman, named Taylor, who had seen her riding with Mrs. Butler in a bus, on their way to meet Townsend after they had got Mrs. Butler's money.

Their defense was an alibi.

The statement of questions involved alleges three grounds for reversal.

(1) The court permitted John J. Mulhearn, a sergeant of detectives in Philadelphia, who said he was in charge of the police bureau dealing with "pickpockets, larceny by trick, con men, shop-lifting and all larcenies by trick", to describe the *modus operandi* of this particular larceny trick, which he said was known as the flim-flam or drop-pigeon. Counsel for defendants objected to the admission of this testimony. We think it was properly received. The ingenuity of crooks and swindlers is being constantly exercised in the invention of new forms of bunco games or confidence games, by which to trick credulous and gullible victims out of their money, and it is entirely proper that one who is familiar with the details of such tricks should describe them to the jury, who probably are not acquainted with the methods of operating them used by light-fingered gentry and who, otherwise, might not fully understand that the occurrence was a recognized form of bunco or confidence game. Similar testimony has been admitted in prosecutions dealing with methods of gambling and lotteries, such as craps, policy writing, numbers game, etc., and other forms of illegal activities. See *Com. v.*

*Banks,* 98 Pa. Superior Ct. 432, 434-5; *Wilkinson v. Gill,* 74 N. Y. 63, 67; *Com. v. Chirico,* 117 Pa. Superior Ct. 199, 208-9, 177 A. 591; *Com. v. Carr,* 137 Pa. Superior Ct. 546, 553-4, 10 A. 2d 133; *Com. v. Lund,* 142 Pa. Superior Ct. 208, 213-17, 15 A. 2d 839; *Plotnick v. Penna. Public Utility Comm.,* 143 Pa. Superior Ct. 550, 555-6, 18 A. 2d 542; *Com. v. Saeli,* 146 Pa. Superior Ct. 555, 22 A. 2d 597; *Com. v. Beauman & Perlman,* 78 Pa. Superior Ct. 336; *Com. v. Campolla,* 28 Pa. Superior Ct. 379.

(2) The defendants contend that the testimony produced in support of their alibis—particularly that of Charles Townsend—was so strong as to require the grant of a new trial. On this point, the learned trial judge aptly said, in the opinion refusing a new trial:

"Counsel's second contention would seem to be that because of the large number of witnesses produced by the defendants in support of their alibis, the weight of the testimony must be found to have been with the defendants and a new trial therefore granted. The alibis in the present case were almost too perfect[2] for the jury to believe and under all the testimony we feel that the jury was entirely justified in finding the defendants guilty. The very lengthy [police] record of Charles Townsend may have had something to do with the failure of the jury to believe his testimony. This record was perhaps wisely brought out by the defendant himself, on the stand, rather than have it brought in by the Commonwealth in rebuttal. When cross-examined on his record as to the type of crime he had been convicted of in his various offenses, the husband defendant, at least once, [actually, in several instances], stated that it was the same kind of crime that was charged in the present case. The defendant also brought out that he had been identified as one of two persons in Scottdale, Pennsylvania, on June 10, 1941. . . . . . . The male de-

---

[2] See A. A. Milne's play, "The Perfect Alibi".

fendant seemed to contend that if he had been in Norristown on June 9th, he could not have been in Scottdale, the western part of the State, on June 10th. Counsel for the Commonwealth argued that with the modern super highway it takes but a few hours to go from Norristown to Pittsburgh. An examination of a late Pennsylvania road map indicates that Scottdale is just about six miles from one of the entrances to, and exits from, such super highway. The jury evidently found some of the defendants' testimony to be unbelievable and by its verdict accepted the testimony of the Commonwealth. With this verdict we feel that we cannot quarrel and it must be upheld."

The court's charge on the defense of alibi was in strict accord with the rulings of the Supreme Court, and is not objected to. We might add that Charles Townsend's son, William, testified that his father and he were in Pittsburgh together from May 31 to June 15, and that they lived together there at the Godfrey hotel, or rooming-house, and that they had signed the register there. As pointed out by Judge CORSON, Charles Townsend admitted being in *Scottdale* on June 10th, and it was also admitted that they had not signed their names in the Godfrey rooming-house register.

(3) The defendants assign for error the refusal of the court to withdraw a juror because of a statement of the district attorney expressing his belief that the defendant Charles Townsend was responsible for the failure of William Knox, a witness subpoenaed by the Commonwealth, to be present in court and testify.

It is proper to note that this point was not presented as a reason for a new trial in the court below, and hence it was not referred to by the lower court in its opinion refusing a new trial.

Charles Townsend had testified on September 16, (testimony, pp. 81-86), in explaining the sources of his income, that he conducted a rooming-house with his wife at 620 South 19th Street, Philadelphia, and that

he had been a partner since 1933 with a man named Knox—he didn't know his first name—in the garage and auto repair business at 617 South 19th Street, just across from his rooming-house. The district attorney's investigations had been such as to satisfy him that Townsend's testimony as to his interest in the garage and auto repair business was false; and, accordingly, he had William Knox, who conducted that business, subpoenaed and brought to Norristown that evening, and obtained from him an affidavit that Charles Townsend, whom he knew as Charlie Thomasen—Townsend admitted having a number of aliases—was not a partner in his business, and had never worked there or received any money from him; that his partner was one Claude Harris, who lived over the garage, and with whom he divided the profits equally.

The next day the district attorney called the county detective, who testified that he had subpoenaed Knox and told him to be in court on the 17th, but that he was not there and could not be found in Norristown or Philadelphia.

The district attorney then proposed to introduce in evidence the affidavit which Knox had made the evening before.

The court, realizing that it was not admissible, asked counsel for the defendants, "Is there any objection, Mr. Bean?" To which Mr. Bean said, "Yes sir. I don't know anything of this. This is all news to me. *What is the theory?* I did not get it. You had Knox up here in Norristown?" The district attorney, then, in apparent reply to Mr. Bean's inquiry, which we have italicized, said: "That your defendant[3] has either reached Knox or—"

"Mr. Bean: (Interposing) Wait a minute!

"Mr. Smillie [the district attorney]: That is what we believe firmly.

---

[3] Who was out on bail.

"Mr. Bean: Just a moment. If the court please, I object to that remark.

"Mr. Smillie: Well, I believe it.

"Mr. Bean: One moment. I ask that the stenographer read it and that I be allowed—

"The Court: I do not know that the stenographer took it. We are not going to allow it read—what you have already asked not to be said."

Counsel for defendants then asked that a juror be withdrawn, which the court refused. After some further colloquy, Mr. Bean then said: "I want to say that I object to this affidavit. I know nothing about it", and the court said: "Of course it is sustained. There is no argument about it. The man is not here for cross-examination by you, Mr. Bean. You never gave me even a chance to rule upon it. I sustain the objection and strike out the remarks. The jury will disregard them." And later, the court said to Mr. Bean: "I don't blame you at all. It is perfectly proper for you to make an objection. You are only doing your duty. It is your duty to do so", and sustained his objection and ruled the affidavit inadmissible. This ruling was unquestionably correct. The affidavit was not admissible in evidence.

In his charge, the court said: "So far as the evidence in this case is concerned, there is no evidence that Mr. Knox's absence was brought about by any action of the defendant or any person acting for or on behalf of the defendant in this case. He is not here. He has been subpoenaed, and will be brought in if found, and we will have to take that up as soon as he is brought in upon an attachment. I do not know whether this man being a partner on that day had anything to do with the guilt or innocence of the defendant in this case in any way."

Of course, the remark of the district attorney complained of should not have been made. It was induced,

no doubt, by Mr. Bean's surprised inquiry, "What is the theory." But it should not have been made. However, the jury were told to disregard it and in view of the court's criticism of the district attorney's remark and offer of proof, a majority of this court are of opinion that the circumstance was harmful to the Commonwealth rather than to the defendants. As we have before pointed out, counsel who tried the case did not assign it as a reason in his motion for a new trial.

The assignments of error are overruled. The judgments are severally affirmed and it is ordered that the defendants Charles Townsend and Flossie Townsend appear in the court below at such time as the said court may fix and be committed by that court until they have complied with their respective sentences or such part thereof as had not been performed when his or her appeal was made a supersedeas.