[Crim. No. 4374. First Dist., Div. One. May 7, 1964.]

THE PEOPLE, Plaintiff and Respondent, v. ERNEST L. CLAY, Defendant and Appellant.

88

Bernheim, Sugarman & Gilbert, Irving C. Sugarman and Loren E. Straughn for Defendant and Appellant.

Stanley Mosk, Attorney General, Albert W. Harris, Jr., and Charles W. Rumph, Deputy Attorneys General, for Plaintiff and Respondent.

SULLIVAN, J.—Defendants Ernest L. Clay and Arthur Junior Davis were charged in the first count of an information with burglary (Pen. Code, § 459) and in a second count with grand theft (Pen. Code, §§ 484-487). A jury found defendants guilty on both counts, finding the degree of burglary under the first count as second degree. (Pen. Code, §§ 460, 1157.) Defendant Clay was sentenced to prison on the first count for the term prescribed by law. The sole appellant herein, he appeals from the judgment of conviction and the sentence entered thereon.

On November 19, 1962, at about 11 a.m. defendant and Davis entered Butler's Market in Cloverdale. Although defendant testified that he walked into the store by himself and that to his knowledge Davis was never in the store, Charles Thurow, one of the owners, testified that while he was taking an order on the telephone he saw both men who were Negroes come in the door together. Thurow stated that

to his knowledge there were no other colored persons in his store on the day in question and that the store had no regular Negro customers. Later, as he looked down an aisle from his position at the telephone, Thurow saw Davis standing near the frozen food compartment.

At about this time, Earl Giacolini, the other owner of the store who was stocking shelves, saw defendant at the check-out stand and went up to the front of the store to wait on him. Defendant had a 10-cent bag of potato chips for his purchase and handed Giacolini a one-dollar bill. The latter rang up the sale on the cash register located to his right behind the counter, placed the bill in the till and returned the change to the customer. Defendant then requested a package of snuff which was located in a rack behind Giacolini, about 3 or 4 feet from the cash register, and about 12 to 15 inches from the floor. Giacolini reached for the snuff, causing him to turn partially and to lose vision of both the register and the defendant. As Giacolini brought up a red can of snuff the defendant told him, "No, I prefer the other," so he (Giacolini) reached for the other, after which the defendant asked for some cigarette papers located next to the snuff. Giacolini took 20 cents in payment for the two items and returned the balance of the change to defendant. During this transaction, which occurred in a "matter of seconds," the defendant was standing approximately 3 to 4 feet distant from the cash register, and Giacolini did not notice any change in his position.

Giacolini then saw defendant leave the store. During all the time he was waiting on the latter, he saw no other persons around the check stand. Nor did he see defendant's companion Davis in the store at any time.

During the course of the above events, one Milton Holt, a Cloverdale merchant, entered Butler's Market by the rear entrance. He fixed the time as approximately 11:15 a.m. As he was walking through the store, Holt saw defendant and Davis at the check stand. Davis was facing away from Holt and defendant was sideways to him, looking into the check stand area. Holt kept walking in that direction but temporarily lost sight of Davis. When he reached a point about 5 or 6 feet from Giacolini, Holt saw Davis' "hand, his arm through the opening, his hand balled in a fist coming out of the till." Giacolini was also facing away from the witness and defendant "was sort of half leaning over the counter pointing at something." Holt then saw Davis walk to the rear of the

store with his right hand held out but "still balled up in a fist." He could not see whether there was anything in the hand. Davis went out the rear exit.

Holt immediately told Thurow what he had seen and the two men ran out the rear door after Davis and down the adjoining alleyway to an intersecting street where they saw defendant and Davis just rounding the corner. Thurow ran up to Davis who was "hurriedly walking" to his car. He asked Davis what he had taken out of the store and the latter replied that he had not been in the store. Defendant, who had proceeded down the street, came back and asked Thurow what was wrong. Thurow told him that Davis had taken something from the store. To this, Clay, replied: "He couldn't have because he wasn't in your store." Defendant and Davis then entered their car and Thurow returned to the market. Giacolini and Thurow found that $380 was missing from the cash register.

Thurow reported the incident to the Cloverdale Chief of Police and went with the latter in a police car along the highway in pursuit of the two men. Eventually they overtook them a short distance south of Cloverdale. Thurow stated that some money was missing from his store and Davis replied that he had never been in the store. Defendant and Davis voluntarily returned with the chief in the police car leaving their own car, a Cadillac, on the side of the road. Both men were searched at the police station. No money at all was found on Davis; defendant had only a dollar and some change. Searches of the Cadillac uncovered no money.

Interrogation of both men by the chief of police at the station resulted in the following information: Neither had a driver's license; Davis had a social security card; defendant identified himself as Ernest Lee Clay; he denied that he and Davis were acquainted, stating that he had been hitchhiking from Eureka and that Davis had offered to give him a ride to Richmond, if he would share the gasoline expense.

An officer of the California Highway Patrol testified that on November 8, 1962 (11 days before the events here involved) he had issued a citation to one Copelin Clay whom he identified as defendant; that on that date defendant was driving the Cadillac accompanied by Davis; that a check of the auto registration showed a dealer's temporary report of sale to both Copelin Clay and Arthur Davis; and that both men then stated that they had bought the car.

Over defendant's objection, Inspector Robert Reed of the

Oakland Police Department testified as an expert on the crime of "till tapping" and, as we discuss in more detail *infra*, expressed an opinion that a hypothetical set of facts similar to those in the instant case revealed the "usual procedure of till tappers."

Both defendant and Davis took the stand on their own behalf. Both denied taking the money. Defendant asserted that he entered the store alone and never saw Davis there at any time. Davis insisted that he had never been in the store. According to defendant, they were returning from Eureka,[1] Davis had parked the Cadillac on the side street and defendant had entered the store alone to buy something to eat. He explained that he told the police he did not know Davis because "at first I was unaware what was happening and I didn't want to be involved in nothing, so that's why I told him that." The stolen money was never found.

Defendant contends that the court committed error in admitting in evidence over defendant's objection the expert testimony of Inspector Reed "as to the crime of 'till-tapping' in general" and the opinion testimony of the inspector "as to the guilt" of defendant. The witness was qualified as an expert in the investigation of "till tapping" because of his 26 years' service in the Oakland Police Department, including 8 years on the burglary and grand theft detail.[2] Immediately after the *voir dire* examination the prosecutor directed to the witness a hypothetical question predicated on an assumed set of facts similar to those appearing from the prosecution's evidence[3] and concluding thusly:

---

[1]Defendant's testimony on this point varied somewhat from his extrajudicial statements. He testified that he had driven to Eureka with Davis about November 7 or November 8 to look for work; that he returned to Oakland but went back to Eureka a second time about November 14 this time by bus; that he met Davis there about November 18 and the two men left for Oakland in the Cadillac the next day.

[2]In testifying to his qualifications, the inspector stated *inter alia* that for three or four years while on the above details he "handled all the till taps and store boosts in the City of Oakland," that he conducted training programs for retail stores on till tapping and store boosting and that he made a study of till tapping operations by talking to persons actually participating therein.

[3]The hypothesis of the question was as follows: "... Inspector, assuming the following facts: One, that in a grocery store at a check-out counter a customer comes up and presents a dollar bill for a ten cent purchase. The purchase is then rung up on a cash register, the door of which opens at the time the sale is rung up, that the clerk then counts out the cash to the customer, at which time the customer requests another article, said article being placed such that the clerk must turn

"Now, assuming the facts that I have given to you, Inspector, would you as a—from your experience in the field have any opinion as to what, if any, crime had been committed from those facts?" The witness replied: "That is the usual procedure." Defendant thereupon made certain objections to the questions which appear in the reporter's transcript after the above answer but were nevertheless entertained by the court. The witness was thereupon asked to assume as suggested by the court an additional fact as part of the hypothesis that the two men in question "were seen entering into a four-walled building known as a grocery store." The following then took place: "THE COURT: The objections then are overruled, and the question concerning your opinion as to that set of facts and what, if any, crime it involved may be answered. THE WITNESS: That is the usual procedure of till tappers."

Thereafter in response to a number of prosecution questions, the witness explained his definition of till tapping and what, from his experience, was the "consistent procedure" of till tapping. Among other things, he stated that he could recall of no particular case in his experience where the money was *actually seen being taken* although there were instances where the store clerk would immediately notice that the money was gone and, an alarm having been sounded, the persons involved would be apprehended on the street together. At this point the following testimony was given: "Q. Now, the till tapping then is a crime, that is committed in the stores during the daylight hours, is that correct? A. Any time the store is open."

All of Inspector Reed's testimony was admitted over

---

away from the cash register and reach down for that article; that as the clerk turns back up with this article, the customer states 'Not that one, but the other kind,' causing the clerk to turn back, replace the article, pick up another article, and again start to turn around to face the customer. At which time the customer then states, 'I want another article,' in the same approximate location as the first, causing the clerk to again turn and pick up another article before he finally turns to face the customer and take the money from him for these two further articles. Further assuming that at the time that the clerk is bent over picking up these articles, that another man is seen with his hand leaving the open cash drawer of the cash register, his hand being in the shape of a fist. Further assuming that after this time a sum of money is found to be missing from the cash register. And further assuming that after the transaction at the check-out stand, the two men, the customer and the one who is seen with the hand coming out of the till are seen together on the street getting into the same automobile. ...."

objection. At its conclusion defendant moved to strike the testimony on the grounds of the previously raised objection. The motion was denied. The People then rested.

Although defendant objected in the court below that Inspector Reed did not qualify as an expert, he has not raised any issue before us either in his brief or at oral argument as to the witness' testimonial qualifications. ██ "It is for the trial court to determine, in the exercise of a sound discretion, the competency and qualification of an expert witness to give his opinion in evidence [citation], and its ruling will not be disturbed upon appeal unless a manifest abuse of that discretion is shown." (*Huffman* v. *Lindquist* (1951) 37 Cal.2d 465, 476 [234 P.2d 34, 29 A.L.R.2d 485]. In accord: *Lynch* v. *Birdwell* (1955) 44 Cal.2d 839, 849 [285 P.2d 919]; *Beresford* v. *Pacific Gas & Elec. Co.* (1955) 45 Cal.2d 738, 749 [290 P.2d 498, 54 A.L.R.2d 910].) ██ We find no abuse here. The issue before us is not as to the competency of the witness but whether the matter on which the witness made certain statements—namely the nature and *modus operandi* of till tapping—was a proper subject of expert testimony. No California case answering this precise question has been called to our attention or disclosed by our independent research.

██ As the court said in *People* v. *Cole* (1956) 47 Cal.2d 99, 103 [301 P.2d 854, 56 A.L.R.2d 1435]: "[T]he decisive consideration in determining the admissibility of expert opinion evidence is whether the subject of inquiry is one of such common knowledge that men of ordinary education could reach a conclusion as intelligently as the witness or whether, on the other hand, the matter is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact. [Citations.]" Wigmore, cited in *Cole* in support of the above excerpt, proffers the test thusly: "But the only true criterion is: On *this subject* can a jury from *this person* receive appreciable help? In other words, the test is a relative one, depending on the particular subject and the particular witness with reference to that subject, and is not fixed or limited to any class of persons acting professionally." (7 Wigmore on Evidence, § 1923, p. 21. See also: *People* v. *Hopper* (1956) 145 Cal.App.2d 180, 191-192 [302 P.2d 94]; *People* v. *Flynn* (1958) 166 Cal.App.2d 501, 509 [333 P.2d 37]; *People* v. *Williamson* (1962) 207 Cal.App.2d 839, 847 [24 Cal.Rptr. 734].)

██ Examining the facts of the instant case in the light of these principles, we think that the subject matter of the

inspector's expert testimony was "sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." (*People* v. *Cole, supra.*) The evidence shows that at the crucial moment when Holt saw Davis' hand coming out of the till, defendant was to all appearances not participating in such act but was on the contrary merely a customer engaged in the seemingly innocent act of making additional purchases at the check stand. While defendant, in so doing, directed Giacolini's attention to articles behind the counter and thus caused the latter to turn away from the cash register, defendant's conduct in itself manifested no evil purpose. It is true that from the evidence that defendant and Davis were seen entering the store together and that they were later seen together hurrying to their car, the jury might have inferred that the two men while at the check stand were in fact confederates working together. On the other hand the jury might have concluded that defendant was no more than an innocent bystander at the time when Davis made his own personal decision to take advantage of the open drawer of the register.

It was the testimony of the inspector on the *modus operandi* of till tapping which threw a spotlight on the episode as a whole and thus enabled the jury to see the possibility of a relationship between the acts of the two men. This gave meaning to the evidence and permitted the jury to appreciate that defendant's activities while in themselves seemingly harmless, when considered with those of Davis, might well have been part of a cleverly planned and precisely executed scheme known as "till tapping." Thus the inspector's testimony clearly assisted the jury in determining whether or not defendant's conduct was felonious under all the circumstances.

Somewhat analogous to the case at bench, as we think the Attorney General correctly points out, are those cases where expert testimony has been received in respect to gambling activities. Thus in *People* v. *Newman* (1944) 24 Cal.2d 168, 174-176 [148 P.2d 4, 152 A.L.R. 365], it was held permissible for a police officer who was qualified as an expert in such matters to testify as to the meaning of signs, symbols, letters and figures appearing on betting markers, scratch sheets and other memoranda used in the business of bookmaking and to explain the *modus operandi* of recording bets in such business.[4] The court in *Newman* relied upon *People* v. *Hinkle*

---

[4]In *Newman, supra,* the court held that the action of the trial court in striking out the testimony of the officer was erroneous.

(1923) 64 Cal.App. 375, 378 [221 P. 693] ; *People* v. *Hatfield* (1926) 77 Cal.App. 212, 218 [246 P. 95] ; and *People* v. *Derrick* (1927) 85 Cal.App. 406, 408 [259 P. 481]. In *Hinkle,* arresting officers qualified by experience to give expert testimony as to race-track gambling and bookmaking were permitted to give expert testimony that two papers taken from the defendant were respectively a register of bets and a bookmaker's chart and to state their opinion as to the meaning of certain cryptic letters and figures appearing on the documents. The court there said: ''[T]hey [the officers] had made a study of race-track gambling and its *modus operandi.* ... They had acquired some special knowledge of a subject which is not within the common experience of mankind generally. They possessed a knowledge which ordinarily does not come within the ken of the average member of a mixed jury of men and women—the juror who has moved in only the routine walks of an exemplary life and has not permitted his feet to wander into the forbidden byways frequented by the gamester.'' (64 Cal.App. at p. 378.) In *Hatfield, supra,* the court regarded *Hinkle* as controlling in upholding the expert testimony of police officers establishing that certain slips and papers were such as were used by gamblers for recording bets on horse races. *Derrick, supra,* is to the same effect.

We are persuaded that a valid and helpful analogy exists between the foregoing cases and the instant one. Certainly if police officers qualified by experience in the investigation of bookmakers, can properly give expert testimony concerning the *modus operandi* of gambling activities as reflected in betting markers and other memoranda used in the course of such activities, it would appear that such officers qualified by experience in the investigation of till tappers, can give similar testimony concerning the *modus operandi* of till tapping as reflected in the conduct exhibited by those participating in the latter activities. In each instance the witness possesses a ''special knowledge of a subject which is not within the common experience of mankind generally.'' (*People* v. *Hinkle, supra.*) In each instance the jury can receive appreciable help from the witness on the subject. (See Wigmore, *op. cit.,* § 1923, *supra.*)

Closer to the point at hand and in our view of persuasive authority is the case of *Commonwealth* v. *Townsend* (1942) 149 Pa. Super. 337 [27 A.2d 462], cited by the People. There the court upheld the admission in evidence of the expert testimony of a police officer in charge of a police bureau

dealing with pickpockets, con men, shoplifting and all larcenies by trick, describing the *modus operandi* of a larceny trick known as "flim-flam" or "drop-pigeon." The court observed that the testimony "was properly received. The ingenuity of crooks and swindlers is being constantly exercised in the invention of new forms of bunco games or confidence games, by which to trick credulous and gullible victims out of their money, and it is entirely proper that one who is familiar with the details of such tricks should describe them to the jury, who probably are not acquainted with the methods of operating them used by light-fingered gentry and who, otherwise, might not fully understand that the occurrence was a recognized form of bunco or confidence game. Similar testimony has been admitted in prosecutions dealing with methods of gambling and lotteries, such as craps, policy writing, numbers game, etc., and other forms of illegal activities." (Pp. 463-464 [27 A.2d].)

Defendant argues that the expert testimony here introduced was improper on the authority of *People* v. *Rose* (1890) 85 Cal. 378, 382 [24 P. 817]. In that case Rose was convicted of fraudulently winning money by means of a game of bunco. A detective called by the prosecution as an expert, described the game of bunco generally but not the game actually played by defendants. In connection with this testimony the trial court stated that the question whether the game played by the defendants was a bunco game or not was one of fact for the jury. Affirming an order granting a new trial, the court stated that "The testimony admitted was clearly incompetent under the decision of this court in *People* v. *Carroll*, 80 Cal. 153 [22 P. 129], ... " In *Carroll* the defendant was charged with conducting a banking game in violation of section 330 of the Penal Code. An expert witness called by the prosecution was allowed to testify as to what constituted a banking game. The court stated that whether the game played was a banking game or not was one of law for the court[5] rather than one of fact for the jury. *Carroll* was followed by *People* v. *Gosset* (1892) 93 Cal. 641 [29 P. 246] where the defendant was convicted of playing the game of faro. In that case the court, relying on *Carroll*, held that a witness could not be called for the sole purpose of defining or describing faro since it was for the court to

---

[5]In *Carroll* the judgment and order denying new trial were reversed for the insufficiency of the information, the court holding that no offense was charged under section 330 or any other section.

instruct the jury as to what constituted the game charged to have been played.

The principle found in the above cases is that an expert may not attempt to define a statutory term when its definition is a matter of law on which the court should instruct. It is the court and not the witness which must declare what the law is, it not being within the province of a witness, for example, to testify as to what constitutes larceny or burglary. (See *People* v. *Carroll, supra,* 80 Cal. 153, 159; cf. Wigmore, *op. cit.,* § 1952.)[6] The instant case is distinguishable from the above cases. Here the expert witness did not testify as to what constituted the crime charged but merely described the *modus operandi* of a certain class of criminals. His expert testimony was not directed to a question of law but towards assisting the jury in determining a factual issue, namely that of defendant's *intent* at the time he diverted Giacolini's attention.

Since the witness was testimonially qualified and since, as we have explained, the matter about which he testified was a proper subject of expert testimony, it was permissible to elicit his special knowledge through the use of a hypothetical question however unsatisfactory such a method of examination may be. (Cf. *People* v. *Wilson* (1944) 25 Cal.2d 341, 348 [153 P.2d 720]; *People* v. *Le Doux* (1909) 155 Cal. 535, 554 [102 P. 517], overruled on other grounds in *People* v. *Cahan* (1955) 44 Cal.2d 434, 445 [282 P.2d 905, 50 A.L.R.2d 513]; 2 Wigmore, *op. cit.,* § 686.) Defendant complains that by the particular hypothetical question employed in the instant case (see footnote 3, *ante*), the inspector "was thus permitted to state his opinion that the defendants were guilty of the crimes charged."

 It is a settled and long-established rule, solidly supported by authority in California as well as in other jurisdictions, that a witness cannot express an opinion concerning

---

[6]Wigmore states: "The exclusion of testimonial opinion here [i.e., in respect to law] rests on a ground slightly different from that of all the other instances. The general principle ... is exemplified, to be sure, that the tribunal does not need the witness' judgment and hence will insist on dispensing with it. But here it is not that the *jury* can of themselves determine equally well; it is that the *judge* (or the jury as instructed by the judge) can determine equally well. The principle is the same; but the peculiarity is that a different member of the tribunal is relied upon as equipped with the data. It is not the common knowledge of the jury which renders the witness' opinion unnecessary, but the special legal knowledge of the judge." (Pp. 81-82.)

the guilt or innocence of the defendant. (*People* v. *Creegan & Becker* (1898) 121 Cal. 554, 559 [53 P. 1082]; *People* v. *Albert* (1960) 182 Cal.App.2d 729, 743 [6 Cal.Rptr. 473]; *People* v. *Mason* (1960) 183 Cal.App.2d 168, 173 [6 Cal.Rptr. 649]; *People* v. *Storke* (1900) 6 Cal.Unrep. 405, 407-408 [60 P. 420]; 2 Wharton's Criminal Evidence, p. 364; McCormick on Evidence, pp. 25-27.)[7] Nevertheless "in this state we have followed the modern tendency and have refused to hold that expert opinion is inadmissible merely because it coincides with an ultimate issue of fact" (*People* v. *Cole, supra,* 47 Cal.2d 99, 105 and authorities there collected) and "It is now well settled that there is in this state no absolute rule that an expert cannot testify to an ultimate issue of fact." (*People* v. *Brown* (1958) 49 Cal.2d 577, 587 [320 P.2d 5].)

The result of the hypothetical question in the case at bench was to place before the jury the witness' opinion that the conduct of defendant and Davis under the facts of the case was consistent with the procedure of a till tapping operation. This was a permissible opinion although directed to an ultimate issue in the case. While we think that the hypothetical question could have been improved by eliminating any use of the word "crime" it is notable that the witness' response was expressed only in terms of the "usual procedure of till tappers." Defendant does not contend here that the hypothesis of the question was not supported by the evidence. (Cf. *People* v. *Wilson, supra,* 25 Cal.2d 341, 349.) In net effect, the question and answer told the jury that the pertinent facts and circumstances were consistent with the *modus operandi* of till tappers. The inspector's opinion was not binding on the jury who were free to determine its weight or to disregard it entirely if they found it unreasonable. (*People* v. *Cole, supra,* 47 Cal.2d 99, 105.) As *Cole* points out, "Where expert opinion evidence is offered, much must be left to the discretion of the trial court." We are

[7]For supporting authorities in the decisions of federal courts and sister states see, for example: *Arpan* v. *United States* (1958) 260 F.2d 649, 659; *Simmons* v. *United States* (1953) 206 F.2d 427, 430; *Wesson* v. *United States* (1947) 164 F.2d 50, 55; *Foreman* v. *State* (1939) 198 Ark. 888 [132 S.W.2d 13, 14]; *Clay* v. *State* (1955) 161 Tex Crim. 351 [276 S.W.2d 843, 845]; *Lee* v. *State* (Ala. 1963) 154 So.2d 45, 46; *State* v. *Borde* (1946) 209 La. 905 [25 So.2d 736, 739]; *State* v. *Miller* (Iowa, 1962) 117 N.W.2d 447, 453; *Grismore* v. *Consolidated Products Co.* (1942) 232 Iowa 328 [5 N.W.2d 646, 663] (dictum); *Commonwealth* v. *Ross* (1959) 339 Mass. 428 [159 N.E.2d 330, 335]; *Bryant* v. *State* (1941) 191 Ga. 686 [13 S.E.2d 820, 840].

satisfied that the trial court did not abuse its discretion in admitting and refusing to strike the inspector's testimony.

Defendant contends that the evidence was insufficient to justify his conviction. The contention is presented without citation of any authority. Defendant's entire argument on the point consists of two sentences, occupying three lines in his brief, to the effect that there is no evidence that he had entered the market with intent to commit a crime and that his conduct was as consistent with innocence as with guilt.

We said in *People* v. *Ford* (1962) 200 Cal.App.2d 905, 916 [19 Cal.Rptr. 758] : "It is a cardinal rule that one who asserts that the verdict is not supported by the evidence, must set forth the evidence involved and point out wherein it fails to support the verdict. [Citation.] As it is stated in *People* v. *Goodall,* 104 Cal.App.2d 242, 249. [231 P.2d 119] : 'It is the duty of the defendants to show error, and that means defendants are under an affirmative duty in that respect. It is not proper to attempt to shift that burden upon the court or respondent. [Citations.]' " The evidence summarized by us above is clearly sufficient to support the conviction. The jury could have reasonably inferred that defendant and Davis entered the market together with the intent to commit theft. (Cf. *People* v. *Smith* (1948) 84 Cal.App.2d 509 [190 P.2d 941].) Contrary to defendant's claim, our proper inquiry here is not whether the defendant's conduct was as consistent with innocence as with guilt but whether it clearly appears that upon *no hypothesis whatever* is there sufficient evidence to support the conclusion reached below. (*People* v. *Newland* (1940) 15 Cal.2d 678, 681 [104 P.2d 778] ; *People* v. *Atwood* (1963) 223 Cal.App.2d 316, 325 [35 Cal.Rptr. 831].) "If, as in the present case, the circumstances reasonably justify the verdict of the jury, an opinion of this court that those circumstances might also reasonably be reconciled with the innocence of the defendant will not warrant interference with the determination of the jury. [Citations.] " (*People* v. *Griffin* (1963) 60 Cal.2d 182, 188 [32 Cal.Rptr. 24, 383 P.2d 432].)

Defendant next contends that the court committed error in restricting his cross-examination of the witness Holt. At the end of his direct examination Holt stated that he had been to a doctor that morning and that he felt "rotten." After completion of the cross-examination by counsel for Davis (covering 20 pages in the reporter's transcript) and after substantial cross-examination by counsel for defendant

(extending over 15 pages) the following took place: "THE COURT: Mr. Sheahan [counsel for defendant], will your cross examination take much longer? I would like to finish with this witness because of the fact he's not feeling very well. MR. SHEAHAN: I appreciate that. THE COURT: I don't want to hurry you. MR. SHEAHAN: I think I can conclude in a matter of a moment, your Honor. THE COURT: Very well. We'll go along."

Defendant's counsel then interrogated Holt as to the time elapsing between his last observation of Davis in the store until he saw him again at the corner of the next street. After Holt gave an estimate of "fifteen, twenty-five seconds, somewhere along that time" the following occurred: "THE COURT: How good are you at estimating when it comes down to seconds, Mr. Holt? THE WITNESS: It depends on how fast I'm running. MR. SHEAHAN: I think that's all." This was followed by redirect examination and recross-examination by counsel for Davis. The court then asked defendant's counsel if there was anything further to which the latter replied in the negative and further inquired whether either side desired the witness to return for any purpose. To this last inquiry defendant's counsel replied: "Not for the defense, as far as I know."

We find nothing in the record showing any undue restriction of defendant's right to cross-examine Holt. The witness appears to have been fully examined by both defendants and the above remarks of the court cannot reasonably be construed as a curtailment of the cross-examination. Additionally it is significant that defendant at no time objected to the court's conduct. (*People* v. *Amaya* (1952) 40 Cal.2d 70, 78 [251 P.2d 324].)

 Finally, defendant contends that the prosecution and the court were guilty of misconduct in referring to the defendants as colored persons. In support of this claim defendant cites three instances, one by the prosecutor, and two by the court in which such references were made. We have carefully examined the pertinent parts of the record and are satisfied that the references in question were made in the course of establishing the defendants' entry into the store together and of identifying the defendants. There is simply no basis in the record for any conclusion that this was done in order to reflect on defendant or place an "emphasis" on his race. At no time did defendant object to, or make any assignment of misconduct in connection with, the re-

marks of either the prosecutor (see *People* v. *Wein* (1958) 50 Cal.2d 383, 396 [326 P.2d 457], cert. denied 358 U.S. 866 [79 S.Ct. 98, 3 L.Ed.2d 99]; *People* v. *Hampton* (1956) 47 Cal.2d 239, 241 [302 P.2d 300]; *People* v. *Codina* (1947) 30 Cal.2d 356, 362 [181 P.2d 881]; *People* v. *Berryman* (1936) 6 Cal.2d 331, 337 [57 P.2d 136]) or the court (see *People* v. *Cheary* (1957) 48 Cal.2d 301, 316 [309 P.2d 431]; *People* v. *Amaya, supra,* 40 Cal.2d 70, 78) and defendant may not now urge the point on appeal.

The judgment and sentence are affirmed.

Bray, P. J., and Molinari, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied July 1, 1964.