[Crim. No. 11512.   Second Dist., Div. Five.   May 8, 1967.]

THE PEOPLE, Plaintiff and Respondent, v. DELORES JEAN CROOKS, Defendant and Appellant.

Kent Ten Brink, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Elizabeth Miller, Deputy Attorney General, for Plaintiff and Respondent.

KAUS, P. J.—Defendant, a prostitute, was convicted of grand theft. The alleged victim was a client whom we shall call Norton. Trial was to the court.

The only question of substance involved in this appeal is the propriety of the admission of certain expert testimony. These are the facts: In the afternoon of January 11, 1965, Norton drove down Western Avenue, alone in his automobile. He saw defendant at a street corner. She motioned him to stop and asked him whether he would like to have a good time. A price of $10 was agreed on. She got into the car and directed him to a house which was in the back of another house. The route which she made Norton take was circuitous. At one point he asked her whether she was "being safe" so that no one would follow them and she said: "Yes." When they arrived at the house defendant made Norton remove his clothes, which included a money belt. It contained about $420. He put the money belt in his pants pocket.

At that point someone knocked on the door, defendant went to the door, opened it a crack to stick her head out and said something, which Norton could not hear, to the person who was outside.

Defendant removed her clothes except her bra and panties and told Norton to come into the bathroom. There she washed his penis for what appeared to him as an unreasonably long time. They then returned to the other room where defendant orally copulated Norton. After the sex act, she went to the window and said "there is people outside" and ran out the door. That is the last he saw of her that day. He could not run after her, since he had no clothes on. He started to get dressed and noticed that the money belt was empty. He later identified defendant at a police lineup.

The People called Officer Putnam, who had served about 10 years on the vice squad. Over objection he testified that he was familiar with a *modus operandi* used by prostitutes in Los Angeles County known as "the creeper." "A creeper" is worked by two people: "They work on the corner. Two girls walking the streets. And after the man makes his selection as to which one he wants she will direct him to a certain address or residence or location. They usually follow a roundabout route to get there in order to give the accomplice time to get to the room and either conceal themselves in the closet or somewhere in the building.

"Following this the female that he has selected will engage him in either an act of sexual intercourse or they will go to

the bathroom and enable the accomplice to come in and go through the man's clothes. Or wallet. Take whatever is there.'' He was then asked whether there was a method to get the victim out of the room in a hurry. His answer: ''Well, if he—if he finds that the money is missing or something of that nature they will create enough confusion between the two of them, or to direct that there is probably police outside; that she hears somebody outside; it's probably the cops. And she'll run or cause enough confusion that the man is left there not knowing what's happening.''

Defendant took the stand. The relevant portions of her testimony were as follows: When she was picked up by Norton she was standing at the corner of Western and 52nd Street with Barbara, a fellow prostitute. When she and Norton arrived at the place where she had her ''trick bed,'' they got undressed, she washed him and while she was copulating Norton he told her that there was someone at the door. She went to the window and saw that it was Barbara with a date. She opened the door a little and told her that she would have to wait. She then completed the act, Norton offered her a lift to her corner, she declined and he departed.

Whether or not the People had a prima facie case without the expert testimony need not be decided. Officer Putnam's testimony, from which it could be clearly inferred that defendant kept Norton in the bathroom to facilitate the theft, was obviously very telling.

To sustain the admission of the expert testimony, the People rely on *People* v. *Clay*, 227 Cal.App.2d 87 [38 Cal.Rptr. 431, 100 A.L.R.2d 1421]. It is necessary to analyze the facts of *Clay* in detail.

Clay and one Davis were jointly charged and convicted of second degree burglary. Clay only appealed. The People's evidence was that Clay and Davis entered a market together. Earl Giacolini, one of the owners of the store, saw Clay at the check out stand and went there to wait on him. Clay had a bag of potato chips for which he handed Giacolini a one dollar bill. Giacolini rang up the sale, put the bill in the till and gave Clay his change. Clay then asked for various items of merchandise. His requests made it necessary for Giacolini to turn and take his eyes off the cash register. While this went on, Clay was standing about three to four feet from the cash register. Giacolini never saw anyone else around the check stand. Another witness, however, saw Davis' hand come out of the till ''balled in a fist.'' He could not see whether Davis

had anything in his hand. Both Clay and Davis left the store. The witness followed them and accused Davis of having taken something from the store. Clay intervened saying that Davis had not been in the store. Later that day both Clay and Davis were arrested together. No money was found on either one, although $380 was missing from the cash register.

As part of its case the People called a police inspector who for several years had "handled all the till taps and store boosts in the City of Oakland." A hypothetical question was asked which included the fact that Clay and Davis entered the store together and described their activities at the check out stand. After overruling an objection the court said: ". . . the question concerning your opinion as to that set of facts and what, if any, crime it involved may be answered." The witness replied: 'That is the usual procedure of till tappers.''

Applying the classic test of *People* v. *Cole*, 47 Cal.2d 99, 103 [301 P.2d 854, 56 A.L.R.2d 1435], the court held the expert testimony to be admissible since the subject of inquiry was a matter "sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." (*Ibid.*, p. 94.) Specifically the court held that the testimony of the inspector on the *modus operandi* of till tapping "threw a spotlight on the episode as a whole and thus enabled the jury to see the possibility of a relationship between the acts of the two men. This gave meaning to the evidence and permitted the jury to appreciate that defendant's activities while in themselves seemingly harmless, when considered with those of Davis, might well have been part of a cleverly planned and precisely executed scheme . . .'' (*Ibid.*, p. 95.)

We think that *People* v. *Clay* is indistinguishable from the present case. The only difference is that in *Clay* there was eyewitness testimony that the confederate of the defendant had his hand in the till, while in the present case the entry into the room where the money belt was and the taking of the money by someone had to be inferred from the presence of such a person just before defendant and Norton went to the bathroom. Such an inference was of course permissible and had the prosecutor asked a hypothetical question—as was done in *Clay*—it would have been entirely proper to ask the witness to assume that someone entered the room while defendant and Norton were in the bathroom.

We reach our conclusion that this case is governed by *People* v. *Clay* with some reluctance. While we do not doubt the

correctness of the holding on the facts of that case, if it is interpreted too broadly, the use of expert testimony would convict defendants not of what they have done, but of what others are doing. The court, in *Clay,* relied on the test for admissibility announced by Professor Wigmore: " 'On *this subject* can a jury from *this person* receive appreciable help?' " (*Ibid.,* p. 94.) We mean no disparagement when we say that in almost every criminal case expert policemen can be and undoubtedly are only more than willing to be of appreciable help to the jury, yet it is easy to imagine hypothetical situations in which the help derived from the expert is too appreciable to permit a conviction to stand. Simply because something a defendant does is "consistent with"[1] the *modus operandi* of some underworld caper, does not make him guilty of an offense.

The limitation to the admissibility of such expert testimony is perhaps the very sentence in *Clay* which holds that there it was properly admitted: "Here the expert witness . . . merely described the *modus operandi* of a certain class of criminals. His expert testimony was . . . directed . . . towards assisting the jury in determining a factual issue, namely that of defendant's *intent* at the time he diverted Giacolini's attention." (*Ibid.,* p. 98.)

Neither in *Clay,* nor in the case before us, was the expert testimony necessary to fill a factual gap in the People's case. The witnesses' expertise merely gave the respective triers of facts background from which they could infer that the somewhat unusual acts on the part of the respective defendants were motivated by an intent to enable a confederate to tap the till or empty the money belt, as the case may be.

The only other point involved in the appeal is this: At the time Norton identified defendant at a police lineup, an officer pointed him out to defendant and asked her whether she had ever seen him before. She said that she had not and that to her "all tricks look alike." Before she made that statement she had been advised that she had a right to counsel, that she had a right to remain silent and that anything she said could be used in court against her. The trial took place in June 1965, therefore the advice was adequate. (*People* v. *Rollins,* 65 Cal.2d 681 [56 Cal.Rptr. 293, 423 P.2d 221].) The only basis on which this evidence, which

[1]This method of expression was made famous—or infamous—in the *Sacco-Vanzetti* case. (See Russell, "Tragedy in Dedham" (1962) p. 159; Frankfurter, "The Case of Sacco and Vanzetti" (1962) p. 77.)

demonstrated a consciousness of guilt, is attacked is the lack of advice that if defendant could not afford counsel, one would be provided for her. That point was, of course, disposed of in *People* v. *Rollins, supra.* It is not argued that the record is rather blank with respect to any positive showing that defendant intelligently and knowingly waived her rights. In *People* v. *Salcido,* 246 Cal.App.2d 450, 455 [54 Cal.Rptr. 820] it is said that "the mere silence of the defendant, after he has been advised of his rights, as an isolated fact, is not a waiver."

There was no objection below and the trial was held well after the second decision in *People* v. *Dorado,* 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361]. (Cf. *People* v. *Davis,* 66 Cal.2d 175, 179, fn. 1 [57 Cal.Rptr. 130, 424 P.2d 682].) Numerous cases have now established that any problem concerning the admissibility of an incriminating statement under the *Escobedo-Dorado* doctrine must be preserved by an objection in the trial court. (*People* v. *Siegfried,* 249 Cal. App.2d 489, 494 [57 Cal.Rptr. 423]; *People* v. *Valencia,* 249 Cal.App.2d 370, 375 [57 Cal.Rptr. 567]; *People* v. *Warrick,* 249 Cal.App.2d 1, 3-4 [57 Cal.Rptr. 121]; *People* v. *Sanchez,* 239 Cal.App.2d 51, 55 [48 Cal.Rptr. 424]; cf. *People* v. *Perez,* 62 Cal.2d 769, 774 [dictum] [44 Cal.Rptr. 326, 401 P.2d 934].)

The judgment is affirmed.

Hufstedler, J., and Stephens, J., concurred.