[Crim. No. 12835.   Second Dist., Div. Four.   May 14, 1968.]

THE PEOPLE, Plaintiff and Respondent, v. ALEX PAUL SOTO, Defendant and Appellant.

Daniel L. Dintzer, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and S. Clark Moore, Deputy Attorney General, for Plaintiff and Respondent.

FILES, P. J.—A jury found appellant Alex Paul Soto guilty of possession of marijuana, in violation of Health and Safety Code section 11530. His codefendants, Goodwin and Kramer, were found guilty of the sale of marijuana (Health & Saf. Code, § 11531). Since this is the appeal of Soto alone from the judgment against him, it will not be necessary to describe the entire record of the trial. ■ In passing upon the appellant's contention that the evidence is insufficient to support the verdict, the evidence most favorable to the People must be considered, including every fact which the jury could reasonably have deduced from the evidence. (*People* v. *Newland*, 15 Cal.2d 678, 681 [104 P.2d 778].)

Those facts include the following:

On December 4, 1965, police officers commenced a surveillance of an automobile repair garage located at Michael Street

and Washington Boulevard in the Culver City area. They observed activity leading them to believe the garage was a source of marijuana sales. During the morning of December 8 they saw defendant Goodwin meet defendant Kramer at the garage entrance. The two looked around the area and then entered the garage. When they emerged two or three minutes later, Goodwin was carrying a cardboard box 10 to 12 inches long and 2 or 3 inches thick. They looked in both directions and then walked to a Ford automobile parked nearby on Michael Street. Goodwin placed the box in the trunk compartment of the Ford, entered the driver's seat, conversed briefly with Kramer, and drove away. The officers followed in another vehicle.

Goodwin drove to Washington Boulevard and turned west. After about four or five blocks he turned left and stopped directly in front of appellant, who was standing on the sidewalk. Appellant entered the car and it drove away. The Ford then proceeded on a ''zigzag'' course to Venice, eventually going down an alley and parking in a carport underneath an apartment house at 109 Breeze Street. Goodwin and appellant stepped out, Goodwin unlocked the trunk, removed the cardboard box and handed it to appellant. Goodwin then closed the trunk and removed the key. Appellant, carrying the box, walked towards the entrance to the apartment house, followed by Goodwin 2 or 3 feet behind. As appellant opened the door to the building, Officer Olsen said ''Fellows, police officers'' and they stopped. The officer testified that the following conversation ensued:

''I said, 'What is in the box?' At which time the defendant Soto said, 'Nothing is in the box.'

''I said, 'Where are you going?' Looking at both the defendant Goodwin and the defendant Soto.

''Both stated, 'We aren't going anywhere.'

''I said, 'Do you live in the apartment?'

''And both stated, 'No.'

''I said, 'Do you have friends in the apartment?'

''And they said, 'No.'

''I said, 'What apartment are you going to?'

''And neither answered.

''At this time I informed them that both had a right to an attorney, to remain silent, that anything they said could be used against them.''

Officer Olsen then arrested both men and took the box. It contained a brick of compressed marijuana weighing approximately 1 kilogram, wrapped in cellophane.

■ Appellant does not deny that he was carrying the contraband at the time of his arrest, but he does contend that the evidence fails to show he knew at that time what was in the box.

■ The People were of course required to prove that appellant had knowledge of the character of the article possessed, but this is something which may be established by circumstantial evidence. (*People* v. *Groom,* 60 Cal.2d 694, 696 . [36 Cal.Rptr. 327, 388 P.2d 359].) Among the circumstances to be considered are the statements made by the appellant to the investigating officers and on the witness stand.

Appellant testified at the trial to this effect: He was looking for an apartment to rent on the morning of his arrest. Failing to find what he wanted in the Culver City area, he started walking west on Washington Boulevard "toward the Venice area." Seeing his friend Goodwin driving by in a Ford, appellant whistled and waved to him. Goodwin stopped and offered a ride. Appellant had in mind a particular apartment for rent at 109 Breeze Street in Venice, which he had learned about "through the paper." Goodwin drove him to that address. After parking the car in the carport, Goodwin opened the trunk of the car and removed a package which he asked appellant to hold. Appellant's testimony as to what happened next is of particular interest:

"Q. All right. Now, after Mr. Goodwin said, 'Hold the package a minute' and handed you the package, then what happened?

"A. I turned around and made a motion to walk from here. After he had told me that he would wait for me, that he would go with me, I proceeded to about here, and he was somewhere still about here. That's when Officer Olsen, I believe, because he was the one that approached me first, had come out of his car here and had hollered 'Hold it.' I stopped—"

Appellant denied that he had ever been to this building before.

■ The evidence produced on behalf of the People, absent any other explanation, makes a sufficient case. There could be no doubt that Goodwin was engaged in delivering a kilo of marijuana to someone. He picked up the contraband at the garage, then picked up appellant a short distance away as though by prearrangement, then drove a circuitous route, but without intermediate stops, to 109 Breeze Street in Venice. There he handed the contraband to appellant, who was carrying

it into the building, escorted by Goodwin, when the police identified themselves.

Appellant's version, read in the light of the undeniable physical facts, presents this picture:

As appellant walked the streets of Culver City searching for an apartment, he was offered a ride by Goodwin who was then engaged in delivering a kilo of marijuana. At appellant's direction they drove to an apartment which appellant had seen advertised, and which must have been the exact place where Goodwin wished to deliver his package. At any rate, when they stopped in the carport underneath the building Goodwin handed the box to appellant. Although there is some suggestion in appellant's testimony that he thought he was only holding the box while Goodwin closed the trunk and repositioned the spare wheel which interfered with access to the trunk, appellant's own testimony agrees with that of Officer Olsen in this: that appellant walked towards the door of the building carrying the box, with Goodwin immediately behind. Thus appellant portrays himself as walking into an apartment house which he had never entered before, intending to look at an apartment for rent, carrying a box weighing approximately a kilogram, without knowing anything about what was in it or why he was carrying it into the building.

A story so improbable may be taken by the jury as a fabrication compelled by appellant's knowledge that the truth would not help him.

Appellant's credibility was further impeached by his admission that he had twice been convicted of a felony.

The jury was entitled to consider it unlikely that a person engaged in delivering a substantial quantity of marijuana would pick up a passenger en route unless the passenger was either an accomplice or a person the driver intended to use as a dupe to effectuate the delivery. But in the latter case the passenger would not select the place of delivery. There is no explanation, credible or otherwise, for appellant's carrying the box with him as he entered the building purportedly to apply for a vacant apartment.

The record, read as a whole, virtually compels the inference that appellant knew what he was carrying.

Appellant argues here that he was illegally arrested, but no objection to the introduction of any evidence was made by appellant upon this ground in the trial court. Doubtless appellant's attorney there was satisfied that the prosecution had proved—or, if challenged, could prove—probable cause

for the arrest. The issue may not be raised for the first time on appeal. (*People* v. *Robinson,* 62 Cal.2d 889, 894 [44 Cal. Rptr. 762, 402 P.2d 834].)

■ Appellant's third point is that the trial court erred in receiving, over his objection, certain testimony of Officer Olsen as an expert on the usages of the narcotics traffic.

After appellant's objection had been argued and overruled, the opening question was:

"Q. By MR. TANENBAUM: Sgt. Olsen, the conduct of the defendants Mr. Kramer, Mr. Goodwin and Mr. Soto, on the 8th of December, 1965, was that, in your opinion, consistent with the method of operation you have told us about, and how narcotics are sold here in the County of Los Angeles?

"A. Yes."

The prosecutor then asked, "In what manner?"

In the succeeding answers the officer made the following points:

(1) Goodwin parked behind the garage, across an alley on a side street, when he could have parked in front of the garage;

(2) He looked in all directions as he came around the corner;

(3) All of the time Goodwin and Kramer were talking they kept turning their heads as if to watch for other people;

(4) Goodwin drove about two blocks in the curb lane, then changed to the center lane of Washington Boulevard before turning left and picking up appellant, who entered the car without hesitation;

(5) The answers which appellant and Goodwin gave the officer were evasive;

(6) It is common to go to another apartment or house to package a narcotic, "the theory being it may be cooler than their own house or apartment where we may be watching them."

(7) "Q. Excuse me. In what manner, then, would the picking up of Mr. Soto have in being consistent with the normal operations of the illegal traffic in marijuana?

"A. Well, I have observed this many times in the past, where a person comes into a location. He will drop his customer off a block or a half a block or three-quarters of a block away, proceed to the spot I am watching, make his transaction, and then turn and pick up the person who was with him.

"Q. And what would be the purpose of that, based on your experience?

"A. To protect the person at the location from meeting a stranger, or to protect his extra income from being a middle man."

■ This statement of the general rule appears in *People v. Cole*, 47 Cal.2d 99, 103 [301 P.2d 854, 56 A.L.R.2d 1435]: "Although courts have not always used the same language, the decisive consideration in determining the admissibility of expert opinion evidence is whether the subject of inquiry is one of such common knowledge that men of ordinary education could reach a conclusion as intelligently as the witness or whether, on the other hand, the matter is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact."

■ In *People* v. *Clay*, 227 Cal.App.2d 87 [38 Cal.Rptr. 431, 100 A.L.R.2d 1421], Clay and Davis were convicted of burglary and grand theft. The evidence showed that Clay had entered a store, made a purchase, and then made a series of requests for other articles which were in a rack close to the floor. In reaching for these articles the storekeeper was required to turn away from the cash register. During these activities another customer entered the store and saw Davis withdrawing his hand from the till. Later it was discovered that $380 was missing from the cash register. At the trial a police officer testified, in answer to a hypothetical question predicated on those facts: "That is the usual procedure of till tappers." The court held the evidence admissible and affirmed Clay's conviction. The court said, regarding the officer's testimony (at p. 95):

"This gave meaning to the evidence and permitted the jury to appreciate that defendant's activities while in themselves seemingly harmless, when considered with those of Davis, might well have been part of a cleverly planned and precisely executed scheme known as 'till tapping.' Thus the inspector's testimony clearly assisted the jury in determining whether or not defendant's conduct was felonious under all the circumstances."

The *Clay* decision was followed in *People* v. *Crooks*, 250 Cal.App.2d 788 [59 Cal.Rptr. 39], where a prostitute was convicted of grand theft. In that case the evidence showed that the defendant had detained the victim in the bathroom, and that afterwards he discovered that the contents of his money belt had disappeared from the bedroom, where he had left his clothes. A police officer testified that he was familiar with the *modus operandi* used by prostitutes and known as "the

creeper,'' where one prostitute detains the undressed victim while another enters the bedroom and goes through the victim's clothes.

Both the *Clay* and *Crooks* cases involved conduct the significance of which might have been missed by the jury without some information about the special techniques used by criminals. The devices of the "till tapper" and the "creeper" were thought to be outside the common experience of the ordinary juror.

The principles applied in those cases offer no support for most of the expert testimony in the case at bench. The officer's opinion that the defendants' conduct was "consistent with the method of operation" of narcotics sellers was based essentially upon the fact that the defendants had appeared to be furtive. Of the specifications cited by the witness, items (1), (2), (3), (5) and (6) meant only that the defendants acted like people who were trying to conceal something. The witness did no more than point out an inference which the jurors were quite capable of drawing for themselves from the facts in evidence. The conclusion of the expert added nothing of evidentiary value. The same is true as to item (4). The jury could decide for itself whether the behavior of Goodwin and appellant, as shown by the testimony, indicated that they had met by prearrangement. It was the function of counsel, in arguing the case to the jury, to marshall the evidence upon these subjects and point out to the jury the inferences to be drawn. The expert witness offered nothing more than that. As Judge Learned Hand said, "Argument is argument whether in the box or at the bar, and its proper place is the last." (*Nichols* v. *Universal Pictures Corp.* (2d Cir. 1930) 45 F.2d 119, 123.)

Of all the expert testimony referred to above, item (7) alone may be said to come within the rule of admissibility. There the witness was giving the jury information about a custom of the narcotics trade which might not be known to the jury, that is, that the middleman ordinarily avoids taking his customer to his source of supply for reasons peculiar to that business. That is a factual matter outside common experience which might be of assistance to the jury in determining whether appellant had been on the street corner by prearrangement with Goodwin, and if so, for what purpose.

Although a part of the officer's testimony should not have been received, the error could not have affected the result. The evidence of guilt was strong, and appellant's own improbable

story eliminated any doubts which the jury might otherwise have had. There has been no miscarriage of justice and appellant is not entitled to a retrial. (Cal.Const., art. VI, § 13; *People* v. *Watson,* 46 Cal.2d 818, 834 [299 P.2d 243].)

The judgment is affirmed.

Jefferson, J., and Kingsley, J., concurred.