## Fairmount Engine Company, Appellant, v. Montgomery County.

368

Argued December 19, 1938. 

 Before KELLER, P. J., CUN-
NINGHAM, BALDRIGE, STADTFELD, PARKER and RHODES,
JJ.

*Desmond J. McTighe,* of *Fox & McTighe,* for
appellant.

*Harry M. Sablosky,* with him *Maxwell Strawbridge,*
County Solicitor, for appellee.

OPINION BY CUNNINGHAM, J., April 12, 1939:

It is admitted in the pleadings in this case that the
plaintiff fire company, appellant herein, through its
officers, was conducting an illegal public lottery in its
engine house at Main and Astor Streets, Norristown,
Montgomery County, Pennsylvania, on the evening of
August 17, 1935. It is also undisputed that on the
same evening a detail of state police stopped the lottery,
confiscated certain gambling paraphernalia, arrested
the president of the fire company along with a member

of the house committee, broke open a safe in the basement of the fire house, seized the contents—$21,135.56 in cash and $148.92 in checks—retained the same as evidence until after the disposition of certain criminal proceedings, and then, through the district attorney, turned the cash and checks over to the treasurer of the County of Montgomery, appellee herein, as forfeited contraband.

The action below was assumpsit by the fire company to recover the total sum of $21,284.48, upon the ground that its seizure and payment into the county treasury were unwarranted and illegal. In its affidavit of defense the defendant county admitted the seizure of the money by the police and delivery thereof to it, but by way of "new matter" averred the money seized had been acquired through the sale of illegal lottery tickets; was the fund out of which the prizes were about to be paid; had neither been taken back by the purchasers of tickets, nor paid over to any winners in the lottery; had not been reduced to the exclusive possession and ownership of the plaintiff fire company; but, on the contrary, was an integral part of the admittedly illegal gambling operation. In general, the defense was that the fire company had no legal title to the money, but had been merely a stakeholder thereof, and that the same was rightfully in the possession of the defendant county as "forfeited contraband."

At the trial before CORSON, J., and a jury, there was evidence, hereinafter mentioned, to the effect that $200 of the currency found in the safe had been acquired from sales by the fire company of candies and cigars. The result of the trial was a verdict for the plaintiff fire company in the sum of only $218—evidently the $200 above mentioned with interest from April 16, 1936, the date the entire fund was transferred to the county, to September 27, 1937, the date of trial. Plaintiff's motions for judgment in its favor for the full amount of its claim, notwithstanding the verdict, or for a new

trial, were denied. It now appeals from the judgment entered on the verdict.

Although numerous assignments of error have been filed, the inquiry for our consideration and disposition boils down, under appellant's statement of questions involved, to this: Is there competent evidence upon this record from which a jury could reasonably be permitted to find that the $21,084.48 for which recovery was denied was being held by appellant as a stakeholder awaiting the drawing of the lottery, and was so earmarked and segregated as to be identifiable as an integral part of the illegal gambling operation. If so, the case was properly submitted to the jury and the judgment should be affirmed.

The principles of law by which we must be guided in disposing of this appeal have been restated and illustrated in the recent cases of *Rosen v. Superintendent of Police Le Strange et al.,* 120 Pa. Superior Ct. 59, 181 A. 797, and *Appeal of Joe Curcio,* 106 Pa. Superior Ct. 53, 161 A. 627. It is argued by counsel for appellant that money and checks are not "gambling devices," within the meaning of Section 60 of the Act of March 31, 1860, P. L. 382, 18 PS §1445, authorizing officers of justice to "seize upon, secure and remove any device or machine of any kind, character, or description whatsoever, used and employed for the purposes of unlawful gaming." While this is true as a general proposition, money and checks may, under certain circumstances, be subject to seizure along with gambling devices and machines.

In the Rosen case, supra, the police raided his apartment and arrested him, along with others, for maintaining a gambling house. At the same time they took $42.60 in cash from his pocket which they refused to return upon his discharge for lack of evidence at a hearing before a magistrate on the gambling charge. In ordering a return of the money thus taken from his person, we said (pages 61, 62):

"Money is not, ordinarily, itself, an instrumentality of gambling. It may be, as when men gamble on the toss of a coin. But usually it is the stake or profit of gambling, not an instrumentality, device or apparatus for gambling. Cards, dice, roulette wheels, slot machines, punch boards, certain kinds of boards or tables, lottery tickets, policy slips, 'numbers' books and slips are among the common forms of gambling devices and apparatus.

"Money may, nevertheless, be subject to seizure, along with *contraband* gambling devices, apparatus or instrumentalities, *(Com. v. Sinn,* 82 Pa. Superior Ct. 482, 484; *Com. v. Kaiser,* 80 Pa. Superior Ct. 26, 28) when the circumstances are such that it is clearly apparent that it *formed an integral part of the illegal gambling operation* and, being commingled with other such money, had not, previous to the seizure, been reclaimed and taken back into his own possession by the player, nor been received and reduced to the exclusive possession and ownership of the winner, or owner of the gambling device, or proprietor of the gambling establishment. Thus money found in a gambling slot machine, when seized, may be held with the machine and be confiscated by the Commonwealth; for while it had passed out of the ownership of the players, who inserted it in the machine, it had not been reduced to the possession and ownership of the proprietor; he does not become the owner of the money while it is contained in a receptacle within the illegal and contraband gambling machine. So money found lying on a roulette wheel, or rouge et noir table, when the gambling device is seized, if so commingled that its prior ownership has been lost, may, in like manner, be subject to confiscation, *Com. v. Sinn,* supra, p. 484. Money received for *lottery tickets* and 'policy' slips and from playing 'numbers,' *and held awaiting the drawing of the lottery, or the determination of the winning number, if earmarked or segregated so as to be identified as part of the gambling operation,*

may likewise be confiscated as contraband by the authorities along with the gambling instrumentality." (Italics supplied).

In the Curcio case, supra, detectives raided his billiard room and confiscated certain equipment and paraphernalia which was then being employed in conducting an illegal lottery commonly known as the "numbers" game, (*Com. v. Banks,* 98 Pa. Superior Ct. 432, and *Com. v. Chirico et al.,* 117 Pa. Superior Ct. 199, 205, 177 A. 591) ; they also seized $595.65, which several men were counting on a table, as well as $320 found in a cigar box. Curcio pleaded guilty to operating a lottery and subsequently petitioned the quarter sessions for the return of the $915.65 seized by the detectives, alleging the money in the cigar box had been derived from the operation of his billiard tables and was not connected in any way with the lottery and that the money found on the table, although admittedly paid to him by the players in the lottery, belonged to him as its conductor. The quarter sessions ordered the $320 returned and Curcio appealed from its refusal to direct the return of the remainder. KELLER, J., (now President Judge), in affirming the refusal of the court below to return the admitted proceeds of the lottery, said (page 56) : "If this money represented money that had been paid in by purchasers of tickets the day before, and was seized before there had been *any determination or awarding of prizes,* as was the case, then the money belonged to the purchasers of the tickets and not to this petitioner, who stood as a sort of *stakeholder* with moneys of others placed in his hands by virtue of the gambling transaction. See *Conklin v. Conway,* 18 Pa. 329." (Italics supplied).

In the course of the opinion of this court in the Rosen case, the Curcio case was thus referred to: "That case illustrates the distinction above made. The money which had been received from the persons who played the 'numbers' game and was being sorted into packages,

at the time the place was raided, was properly seized and retained by the police authorities, but other money found in the place, which had been received from the operation of Curcio's billiard tables, and was not identifiable with the illegal lottery was rightly ordered returned to him."

With this understanding of the applicable principles of law, we turn to an examination of the evidence adduced at the trial.

Appellant by its pleadings admitted the operation of the lottery in its engine house on August 17, 1935, the raid and seizure of the money by the police from its safe, and that Grant Bolton, its president, and Frank Bessey, a member of its house committee, pleaded guilty to an indictment charging them with setting up and conducting the lottery. While the lottery was operated largely on the ground floor of the fire house, the locked safe containing the proceeds was found by the officers in the cellar, the door to the cellar being locked at the time of the raid.

The oral testimony in behalf of appellee may be thus summarized: Officers Hartman and Nicholson, dressed in civilian clothes, visited the fire house about two o'clock on the afternoon of the raid. At that time there were from fifteen to eighteen men in the street or main floor of the fire house selling lottery tickets at the rate of ten cents apiece or three for a quarter. After remaining there about a half hour they left, returning about eight p. m., both still wearing civilian garb. By that time a crowd of about a thousand people had gathered inside the fire house on the ground floor. These officers remained there until a few minutes before nine, when they left to summon the raiding squad. During this time many tickets were sold and the officers observed "a steady stream" of between seventy-five and one hundred persons going down to the basement through a doorway marked "Office," carrying cigar

boxes full of tickets and money, along with money bags, and emerging empty handed a few minutes later.

While the officers were still there, several hundred thousand lottery ticket stubs were brought up from the basement in baskets and dumped into a large octagonal shaped drum, constructed with glass sides and placed upon a raised platform in the front of the room. A few minutes before nine, a little girl drew a stub from the drum and handed it to President Bolton who read out a number which was recorded upon a pad by another person seated on the platform.

Officers Hartman and Nicholson then left and returned with the uniformed raiding squad at nine o'clock, stopped the lottery, seized the gambling paraphernalia and requested the people to file out of the room. At this point Bolton, as president of the fire company, told the crowd he would see that the prizes were paid.

The officers next asked Bolton where the money derived from the sale of the lottery tickets was and he replied, "In the safe, in the cellar." He further stated that the fire company's own money was in a designated bank. They then got Bolton to unlock the door to the cellar where they found an old type safe, about six feet high, five feet wide and four feet deep. The floor of the cellar was strewn with "thousands and thousands" of used lottery ticket stubs, some packed in bushel baskets. On top of the safe were eight or ten empty cigar boxes.

After giving Bolton an hour to open the safe, officer Bell obtained tools from a nearby garage and forced it open. The greater part of the money consisted of cash in the form of bills, mostly of small denominations, which were wrapped up in more than one hundred packages made by running a band of paper around them. The mucilage on some of these bands was still damp when the packages were removed from the safe. More than one thousand dollars in quarters and approximately three hundred dollars in dimes were also

found in the safe. Of the six checks, two were identified by the signers as having been given in payment for lottery tickets. The police also testified that Frank Bessey, who knew the safe combination, but did not appear until they had broken it open, likewise stated the money in the safe "belonged to the drawing" and that the fire company's own money was in the bank.

Both Bolton and Bessey denied having stated to the officers that the money in the safe was derived from the lottery. It appeared, however, from appellant's own witnesses, testifying in rebuttal, that the lottery had been in operation for nineteen weeks preceding the raid; that the fire company had purchased the safe in question about four months before the seizure; and that it had two smaller safes on the second and third floors of the fire house.

John Lawless testified for appellant that he had deposited $50, derived from the sale of cigars, candy, etc., in the cellar safe on the morning preceding the raid, at which time there was only $200 therein, including the $50 deposited. Bolton, however, on cross-examination stated that, so far as he knew, Lawless had nothing to do with any money of the fire company, except that "used in the lottery."

As above indicated, it is contended on behalf of appellant that the only inference fairly and reasonably deducible from the evidence we have just reviewed is that all the money found in the safe had been reduced to its "exclusive possession" and had "lost all connection with the lottery." We cannot agree with this contention.

It may be granted that a presumption of ownership of the contents arose from appellant's possession of the safe. In our opinion, however, the admissions in the pleadings and the oral evidence introduced by appellee were amply sufficient to rebut that presumption, and to support a finding that all the contents of the safe, with the possible exception of $200, had been derived

from the sale of tickets in an illegal lottery and were held by appellant as a stakeholder, awaiting the drawing of winning numbers and the distribution of prizes. The testimony of appellee's witnesses was evidently accepted by the jury as credible, and we think that testimony disclosed circumstances from which a jury could reasonably conclude that at least $21,084.48 of the money and checks in the safe constituted, and was identifiable as, an integral part of the illegal transactions. As such, it was, under the authorities above cited, just as liable to seizure, as contraband, from, and confiscation as against, appellant as if it had been found in an illegal slot machine or on a roulette wheel.

Finally, appellant asserts the verdict was inconsistent because the $200 awarded it, with interest, was not earmarked from the other money in the safe and, since the jury found some of that money was not connected with the lottery, it logically should have found all of it belonged to appellant. The effect of the jury's finding was that all the money except $200 was identifiable with, and derived from, the lottery. It may be that appellant was not entitled to the return of the $200 because it failed to identify or separate it in any way from the other moneys in the safe. Certainly it cannot complain because the jury may have awarded it more than it was strictly entitled to. If there is anything illogical about the verdict, appellant profited thereby and is in no position to raise its last point. None of the assignments can be sustained.

Judgment affirmed.