## Commonwealth *v.* Prezioso, Appellant.

Argued November 13, 1944. Before KELLER, P. J., BALDRIGE, RHODES, HIRT, RENO and JAMES, JJ.

*Harry A. Estep,* with him *M. Barney Cohen,* for appellant.

*George F. P. Langfitt,* First Assistant District Attorney, with him *Russell H. Adams,* District Attorney, for appellee.

OPINION BY HIRT, J., March 5, 1945:

The defendant, with George Sarkis, Lucy Torchia and Joseph Totino, was charged with conducting a 'numbers' lottery. The three pleaded guilty to the charge; defendant alone stood trial. He was convicted and sentenced. As appellant, he contends that the evidence as a whole is not sufficient to warrant his conviction; he also charges trial errors in seeking a new trial.

Sarkis lived at 1219 Epiphany Street in Pittsburgh; Lucy Torchia, his sister-in-law, was a member of his family. Defendant lived two doors away at 1225 Epiphany Street in a house owned by him. Joseph Totino occupied a nearby house in the rear at 1215 Pasture Street. State police officers, upon well founded suspicion that a numbers lottery was being conducted in the two houses on Epiphany street had them under observation for over a week. During that time on a number of occasions they saw Sarkis in company with another, carrying heavy money bags out of defendant's house into an automobile owned by defendant. The car was driven to downtown Pittsburgh and the bags were carried into Pitt National Bank. Sarkis and his compan-

ion on each occasion left the bank shortly thereafter and returned to defendant's home. Many persons were observed going back and forth between 1219 and 1225 Epiphany Street. On one occasion a Negro was seen to give a package to a man who delivered it to defendant's house. During a part of one day six men were observed going into Sarkis' house and eight into the house of defendant, all carrying packages or large envelopes. On search warrants, raids were made on the two houses on February 11, 1944 at 3 P. M. The evidence disclosed by the raid established the existence of a numbers lottery. Books and other materials used by numbers writers were found in Sarkis' house indicating that was the station where the "pick-up" men made their returns. Lucy when arrested there had in her possession a brown bag containing numbers slips. The slips totaled $1,768.98. Later in the afternoon a raid was made on Totino's house where adding machines and other equipment, admittedly used for tabulating the slips as delivered each day, were found. Sarkis alone of the four who were indicted testified in behalf of this defendant. He took the entire responsibility for the conduct of the lottery and attempted to absolve defendant from any part in it.

Defendant was in his home at the time of the raid. In a dresser drawer in his room were found 74 canvas money bags such as are supplied by banks and a large number of coin wrappers bearing the name of Pitt National Bank. There were also many small envelopes containing paper clips, and boxes of rubber bands. The clothes closet off this room was locked and defendant refused to open it. The officers removed the door and in the closet found an unlocked safe and above it on a shelf $4,100 in bills piled against the wall, and $16.77 in coin. A key was found to unlock a closet in an adjoining room and in it was found another unlocked safe containing $35,000 and on it $2,000 in currency in packages of $1,000 each. In the basement in a trash box

were found desk roller tape containing figures. Defendant complains of the admission of all of this evidence.

True, the mere possession of any or all of the things developed by the raid on defendant's house, standing alone, would not be enough to convict the defendant of conducting a lottery. Money in itself is not an instrument of gambling (*Fairmount Eng. Co. v. Montg. Co.*, 135 Pa. Superior Ct. 367, 5 A. 2d 419) unless made so. But all of the materials found in defendant's possession except his personal effects were of kinds used in the conduct of a numbers lottery. Paper clips and rubber bands were carried in envelopes by numbers writers. The returns in money from writers are largely in coin requiring wrapping. Canvas money bags were used under the evidence to convey the wrapped coins to the bank. Currency in large amounts was necessary to pay off the "hits". The jury were justified in concluding the defendant was the "numbers baron" in this lottery and that the separation of the phases of its conduct at three locations was for his protection. Sarkis, Lucy and Totino, admittedly guilty, conducted only two of them—the receiving and tabulating stations. The evidence against defendant supplies the third—the pay-off station—and the three together spell a numbers lottery in all essential respects. There is evidence other than that of intercommunication among the three houses evidencing a common enterprise. A teller at the Pitt bank testified that Sarkis frequently brought money bags containing coin to the bank and exchanged it for currency. The bills delivered to him were in bundles with a paper strap indicating the amount and also the name of the bank. On the straps the teller wrote his identifying number and he also noted his number on the adding machine tape showing the items of coin exchanged for the bills. In defendant's possession were wrapped packages of currency and also adding machine tape marked with this bank teller's number. The money found in defendant's house and the other materials were clearly

admissible under all of the circumstances as evidence of defendant's guilt.

Appellant contends that there was error in the admission of a telephone conversation between a state police officer and an unidentified person. These were the circumstances: During the raid, about 3:30 P. M., the telephone rang and officer Fontaine answered the call on the extension telephone in defendant's room; the defendant was present. A voice said: "Frank?" and he answered "yes". The voice then asked "What's the matter with Lucy she hasn't got here yet?" In view of the separation of phases of the lottery in this case and in the light of other evidence against this defendant we think the conversation was competent as a circumstance on the question of his part in it. Lucy, by her plea of guilt and the testimony of Sarkis, was shown to be the regular messenger who carried the numbers slips from 1219 Epiphany Street where they were delivered by the pick-up men to 1215 Pasture Street, the home of Totino whose part in the scheme was to tabulate the returns of each day's business. Lucy was in custody and so was prevented from delivering the slips which she had in her possession when arrested. The officers did not know of Totino's connection with the lottery until after they had questioned Lucy and the telephone call came before the raid on Totino's house. We think the nature of the conversation made it competent as a material circumstance on the question of the identity of the person who called as one having a part in the conduct of the lottery and on the issue of defendant's participation in it. The telephone was listed in defendant's name and he was the only person named *Frank* at the place of the call. The dead line for the pay-off was 3 P. M. It was a fair inference for the jury that the complaint addressed to the defendant came from Totino or from some person associated with him who was prevented from tabulating the returns,

essential to ascertain the 'hits', by Lucy's failure to deliver. Identification of the person is not always sesential to the admission of a telephone conversation. A business establishment may be bound by the response of an unidentified person who answers the telephone on its behalf under presumptions which arise from the transaction of business by telephone. *Swing v. Walker*, 27 Pa. Superior Ct. 366. So also evidence is admissible of a telephone conversation in response to a call for a designated person at his place of business if the one answering claims to be the person called although his voice is not identified. *Penna. Trust Co. v. Ghriest*, 86 Pa. Superior Ct. 71. Similarly what is said by one initiating a call, by disclosing intimate knowledge, may so identify him and the person whom he calls as associates in the same enterprise as to make the whole conversation admissible.[1] Of course such evidence should be admitted with caution (because of the ease with which it may be counterfeited) and should not be received at all except when the circumstances rebut every suspicion that it may be spurious. This conclusion is not in conflict with *Smithers et al. v. Light*, 305 Pa. 141, 157 A. 489. Here there is nothing to suggest that the evidence was not genuine; defendant did not question it. An inquiry by telephone of this nature reasonably might have been expected in usual course on failure of some essential operation in the conduct of the day's business. The evidence was admissible here under the circumstances; its effect and weight, if any, were for the jury and it was properly submitted.

---

[1] The circumstances attending a telephone conversation with a person, unidentified as to name, as they appear in each particular case must determine whether the conversation is admissible against a defendant. Cf. *McLaughlin v. State*, (Nebraska) 244 N. W. 799; *Beard v. United States*, 82 Fed. 2nd 837 where testimony of this class was received, and *Cumpton v. City Muskogee*, (Oklahoma) 225 P. 562; *Bloss v. State*, (Texas) 75 S. W. 694, where it was refused. See also, Annotations, 71 A. L. R. 5; 105 A. L. R. 326.

The proofs here are not consistent with innocence and the evidence, though wholly circumstantial as to this defendant, was sufficient both in kind and quality to sustain the conviction even under the rule of *Com. v. Byers*, 45 Pa. Superior Ct. 37, the ally in times past of many a guilty defendant. The trial judge however did not require that high degree of proof but said to the jury: "A crime charged may be wholly sustained by circumstantial evidence where the circumstances proved are such as reasonably and naturally justify an inference of guilt of the accused, and are of such volume and quality as to overcome the presumption of innocence and satisfy the jury of the accused's guilt beyond a reasonable doubt." This is the rationalized principle of *Com. v. Marino*, 142 Pa. Superior Ct. 327, 16 A. 2d 314, followed by us in *Com. v. Johnson*, 153 Pa. Superior Ct. 437, 34 A. 2d 170; *Com. v. Meyers*, 154 Pa. Superior Ct. 8, 34 A. 2d 916. The rule of the *Marino* case has been given sanction by our Supreme Court in *Com. v. Libonati*, 346 Pa. 504, 31 A. 2d 95, in *Com. v. Holt*, 350 Pa. 375, 39 A. 2d 372, and more recently in the dissenting opinion in *Com. v. De Petro*, 350 Pa. 576, 39 A. 2d 838. It will be noted also that the majority opinion in that appeal, while it does not refer to the *Marino* case or others which followed it, nevertheless applies its principle. The *De Petro* case, as indicated by the majority opinion of the Supreme Court, has much in common with the present appeal. There as here, though a substantive crime was charged, the proofs also established a conspiracy or criminal plan in which the defendant participated with others. The trial judge here in clear language properly instructed the jury as to the nature of the charge and the applicable principles of law; we find no fundamental error in the charge.

Judgment affirmed, and it is ordered that the defendant appear in the court below at such time as he may be there called, and that he be by that court committed

until he has complied with the sentence, or any part of it, which had not been performed at the time the appeal was made a supersedeas.