**IN RE: RETURN OF PROPERTY CONFISCATED OCTOBER 30, 1999 FROM 411 EAST MAC DADE BOULEVARD Glenolden, Delaware County, Pennsylvania**

**Appeal of: Michelle Longo**

Commonwealth Court of Pennsylvania.

Argued June 10, 2004.

Decided July 29, 2004.

Michael P. Dignazio, Media, for appellant.

Vram Nedurian, Jr., Media, for appellee.

Before: SMITH–RIBNER, Judge, LEAVITT, Judge, FLAHERTY, Senior Judge.

OPINION

OPINION BY Judge LEAVITT.

Michelle Longo (Appellant) appeals from an order of the Court of Common Pleas of Delaware County (trial court) granting in part and denying in part her motion for a return of property. This property consisted of cash obtained from her jewelry store pursuant to a search warrant. The trial court concluded that Appellant was entitled to a return of $2,002 but not to the remaining $16,350, which was determined to be contraband derivative of an illegal gambling operation. The trial court agreed with Appellant that there were procedural irregularities with respect to the affidavit supporting the search warrant; however, it concluded that these irregularities were not legally significant and did not justify a return of the $16,350 to Appellant.

BACKGROUND

Appellant is the sole proprietor of the Golden Nugget Jewelry Store (Golden Nugget) in Glenolden, Pennsylvania, which she opened in 1997. Appellant managed the store until May 8, 1998, when she was injured in an automobile accident that disabled her for approximately eighteen months. During this recovery period, Appellant visited the store once or twice a week, but her husband, Louis Longo (Longo), managed the store on a daily basis.

In 1998, the Pennsylvania State Police, Bureau of Criminal Investigation, Organized Crime Division (Commonwealth), began an investigation of certain individuals [1] suspected of engaging in illegal gambling activities, including Longo. On June 14, 1999, the Philadelphia District Attorney's Office obtained a permit from the Superior Court to intercept the wire communications of these suspects. A wiretap of the telephone lines of John Lucas (Lucas), one of the suspects,[2] recorded several conversations between Lucas and Longo, some of which were made to and from the Golden Nugget.[3]

1. The individuals included: William James Patton, Stephen John Sharkey, Neil Fortescue Roosevelt II, John Lucas, Jr., and others known and unknown in association with Patrick Anthony Smyth, Lance Martinicchio, Marc Alexander Tashie, and Louis Charles Longo. *Reproduced Record*, 303 (R.R. ____).

2. Specifically, he was believed to be placing wagers on sports and sporting events.

3. The police intercepted three conversations between Lucas and Longo that were made to and from the Golden Nugget on October 6, 7 and 8, 1999. In the first conversation, Longo asked Lucas to stop at the store to help him get their "figures straightened out, so we know where we're at" and Longo informed Lucas that a bettor came by the store to settle his gambling debt. R.R. 345–346. Further, the bettor asked Longo for that day's betting line. R.R. 346.

Based on these recordings, the Commonwealth prepared an affidavit of probable cause and requested a warrant to search the Golden Nugget, which the Superior Court granted on October 30, 1999. On the same day, the affidavit was sealed for a period of 60 days "for good cause stated in the affidavit(s)" as provided by Pennsylvania Rule of Criminal Procedure 211.[4] R.R. 291. The sealed affidavit, however, was never filed with the clerk of courts in the county where the search was to occur, Delaware County, as required by Pennsylvania Rule of Criminal Procedure 211(D).

On October 30, 1999, the search of the Golden Nugget was executed. The Commonwealth seized, in part, the following: $18,361, paper, pads, a blank check, football pools and stubs, a tally sheet, betting slips, a football magazine, football sched-ules, a calculator, a paper shredder, rice paper cut to small sizes and betting sheets dated October 30 and 31.

On February 1, 2000, Appellant filed a Motion for Return of Property.[5] In her motion, Appellant alleged that the items seized during the search were not the fruits of an illegal crime but the property of Appellant, in particular, the $16,350 that the police removed from a safe. The motion also asserted that the sealed affidavit was defective because it had not been filed with the Delaware County trial court.[6] On the same day, the Commonwealth responded with a *nunc pro tunc* application requesting extension of the sealing order on the affidavit. The Superior Court granted the Commonwealth's application and ordered the affidavit to remain under seal until February 29, 2000.

---

In the second conversation, Lucas and Longo checked their figures with each other and the money that Longo owed the other bookmaking operation. Based on the conversation, it was apparent that Longo kept the paperwork inside the store from which he checked his figures. R.R. 347.

In the third conversation, Lucas called Longo with a horse race tip that he received and wanted to place the bet through Longo. After finding out that Lucas had the horse name and race number, Longo accepted the wager and made note of it while at the store. R.R. 348.

4. The affidavit was sealed pursuant to Pa. R.Crim. P.2011 which was renumbered Pa. R.Crim. P. 211, effective April 1, 2001. It provides, in relevant part:

(A) At the request of the attorney for the Commonwealth, a search warrant affidavit may be sealed upon good cause shown.

　　＊　　＊　　＊　　＊　　＊　　＊

(D) When the search warrant is issued, the sealed affidavit(s) shall be filed with the clerk of courts in the judicial district in which the search warrant is to be executed.
(E) The affidavit shall be sealed for a period of not more than 60 days, unless the time period is extended as provided in paragraph (F) or paragraph (H).
Pa. R.Crim. P. 211.

5. She filed her motion pursuant to Pa. R.Crim. P. 324, which was renumbered Pa. R.Crim. P. 588, effective April 1, 2001. It provides:

(A) A person aggrieved by a search and seizure, whether or not executed pursuant to a warrant, may move for the return of the property on the ground that he or she is entitled to lawful possession thereof. Such motion shall be filed in the court of common pleas for the judicial district in which the property was seized.
(B) The judge hearing such motion shall receive evidence on any issue of fact necessary to the decision thereon. If the motion is granted, the property shall be restored unless the court determines that such property is contraband, in which case the court may order the property to be forfeited.
(C) A motion to suppress evidence under Rule 581 may be joined with a motion under this rule.
Pa. R.Crim. P. 588.

6. *See supra* n. 4 for text of Pa. R.Crim. P. 211(D) related to filing of sealed affidavit with appropriate clerk of courts.

On May 13, 2000, Appellant withdrew her motion. When the parties were unable to resolve their dispute, Appellant renewed her motion. On October 31, 2001, the trial court issued a rule to the Commonwealth to show cause why the confiscated items should not be returned to Appellant.

In response, the Commonwealth served interrogatories on Appellant. The interrogatories resulted in a hearing before the trial court, at which the Commonwealth made an oral motion to forfeit the property seized, including the $16,350 seized from the Golden Nugget. After considering the evidence and legal arguments, the trial court ordered Appellant to respond to the Commonwealth's discovery request within thirty days. Thereafter, the trial court conducted hearings[7] on Appellant's motion to return property and on the Commonwealth's forfeiture petition.[8] Prior to the first day of hearing, Appellant secured a copy of the affidavit filed in support of the search warrant.

On behalf of the Commonwealth, Trooper Christopher C. McBraiarty testified that the taped conversations on the Lucas wiretap revealed that Steven Sharkey (Sharkey) and Patton had a bookmaking operation.[9] They would "lay off" or "[h]edge or work bets," R.R. 33, i.e., balance their books to protect against financial loss, with Lucas and Longo. Although most of the business was conducted by telephone, Lucas would often send the "kids," Sharkey and Patton, to pick up money from Longo when the time came to settle the accounts. Sharkey and Patton were indicted and pled guilty to bookmaking.

Trooper Joseph F. Thompson executed the October 30, 1999 search of the Golden Nugget. He supervised the search and the inventory of gambling paraphernalia recovered on the site, including tally sheets, betting sheets, lines on games, and rice paper. Next to a jewelry display case was a work counter that separated the front of the store from the rear of the store; in a corner behind the counter, a safe, desk and shelves were located. Trooper Thompson explained that most of the gambling paraphernalia in this corner area.

In the safe, the following items were found: cash in the amount of $16,350; a tally sheet; and nine dollars which were set aside in an envelope.[10] On the desk next to the safe, the police found tablets and pads; a telephone; and a football

---

7. The hearings were conducted on March 18, 2003, May 19, 2003 and October 9, 2003.

8. The Crimes Code requires that these motions be conducted in accordance with Section 602(e) of the Liquor Code, Act of April 12, 1951, P.L. 90, *as amended*, 47 P.S. § 6–602(e). It provides:

> (e) At the time of said hearing, if the Commonwealth shall produce evidence that the property in question was unlawfully possessed or used, the burden shall be upon the claimant to show (1) that he is the owner of said property, (2) that he lawfully acquired the same, and (3) that it was not unlawfully used or possessed.

47 P.S. § 6–602(e).

9. Trooper McBraiarty explained that bookmaking is a form of gambling wherein persons take bets from bettors. The bets are taken by phone, fax or computer and the information is documented on a betting sheet. R.R. 27–28. Often the police find a large sum of money at the site of the gambling operation which is used to pay out winners. R.R. 29.

10. Upon questioning by the trial court, Trooper Thompson explained that the $16,350 was not separated into denominations. Typically, the money is sorted when payout time is near. However, he explained that when the police conducted the search, the sporting events had not yet occurred; thus, Longo was not prepared for payout because there were no winners or losers at the time.

magazine and some betting slips. Beneath the desk, the police found two bet sheets dated October 30 and 31, which had been prepared for the sporting events yet to occur.[11] In the right hand drawer of the desk, police found two football pools. On the shelves next to the desk, which were within arm's reach, the police found rice paper.[12] Trooper Thompson concluded that "everything was set up as if that was the particular space in which the gambling operation took place." R.R. 79.

In addition, Trooper Thompson testified that the police found a trashcan containing football pools and stubs for the bottom of the pool. Adjacent to the trash can the police found a paper shredder in the rear corner of the store. The police seized additional cash in the amount of $2,200; $1,460 to $1,464 was found in the middle of a display case; $510 was found on the shelf behind the display case; and $27 was found in a second safe in the northwest corner of the store.

Patton testified that as a condition of his plea bargain, he agreed to testify against others involved in gambling operations.[13] Patton accompanied Sharkey to the Golden Nugget to pick up money and drop off money for the sports wagers placed by "LL" which he understood to be either Longo or Lucas.[14] Further, Patton understood that the Golden Nugget was Longo's sole place of business, and he never saw an employee, a customer, or even Appellant at the store. Longo never discussed the jewelry business or his duties therewith; the sole topic of conversation was gambling. Indeed, Patton never went to the Golden Nugget except to conduct gambling business.

After hearing the Commonwealth's evidence, on June 24, 2003, the trial court issued the following order:

1) Petitioner, Michelle Longo's motion for the return of property based on the Commonwealth's violation of Rule 211(D), of the Pennsylvania Rules of Criminal Procedure is DENIED:

2) the Commonwealth has met its burden of proof by a preponderance of the evidence that the property seized in this matter was derivative contraband of an illegal gambling operation.

Trial Court Order dated June 24, 2003.[15] Thereafter, the trial court scheduled a hearing to allow Appellant to present her case.

At the hearing, Appellant testified that she was at the Golden Nugget with her father during the October 30, 1999 search. Appellant opened the safe, upon request of the police, stating that she was the only person with the combination to it. Appellant planned to use at least $10,000 of the money seized to buy jewelry to stock the

11. During cross-examination, Trooper Thompson admitted that these betting sheets could be evidence that somebody wanted to make bets on the sporting events of those evenings; making a bet is not a crime.

12. Rice paper is used in gambling enterprises because it can be easily destroyed when it gets moist and therefore conceals evidence of a crime.

13. Prior to this, Patton engaged in bookmaking for approximately eight years; thus, the trial court qualified him as an expert in the field.

14. Because Patton was a money runner, he was often referred to as one of the "kids." R.R. 158.

15. The trial court further ordered that an evidentiary hearing would take place on July 21, 2003. See Trial Court Order dated June 24, 2003. However, the record is devoid of evidence that the hearing occurred. The only evidence in the record is that the next and final hearing occurred on October 9, 2003.

store for Christmas. Appellant explained that the $16,350 seized came from her insurance settlement of her claims arising from the automobile accident; savings for Christmas from store profits; and her father. Appellant did not keep the money in a checking or savings account because of bad experiences with credit card companies, which, she asserted, removed funds from her account without permission.

Appellant also testified that Longo managed the store while she was recovering from her accident. Although Appellant began returning to work approximately two weeks before the search, on the day of the search, Longo was still responsible for paying vendors. Longo paid them from funds that Appellant had given him based on her cash flow from the store.[16]

After hearing Appellant's evidence in the matter, on October 20, 2003, the trial court issued the following order:

> The Commonwealth's Motion for Forfeiture is GRANTED in part and DENIED in part. Sixteen thousand, three hundred fifty nine dollars ($16,359.00) and all personal property seized from 411 E. MacDade Blvd. on October 30, 1999 is hereby FORFEITED. As to the remaining two thousand two dollars ($2,002.00) seized, the Commonwealth's motion is DENIED.
> [Appellant's] 'Motion for Return of Property Pursuant to Pa. R.Crim. Proc. 324' is GRANTED in part and DENIED in part. Two thousand two dollars ($2,002.00) shall be RETURNED to Petitioner. As set forth above, the remaining property and currency seized from 411 E. MacDade Blvd. on October 30, 1999 shall be FORFEITED. Therefore, the remainder of [Appellant's] motion for return of property is DENIED.

Trial Court Order dated October 20, 2003.

Appellant appealed to this Court, asserting that the Commonwealth did not meet its burden of proving that the $16,350[17] was derivative contraband but, rather, Appellant proved that the seized cash was lawfully derived. Appellant also asserted that the Commonwealth's failure to file the affidavit with the trial court until thirty-four days after it had expired violated her constitutional rights.

Thereafter, the trial court issued its opinion in support of its order. It found that the evidence of the taped conversations establishing that gambling was conducted at the Golden Nugget, Patton's testimony about the gambling activities at the Golden Nugget, and Trooper Thompson's testimony about the significance of the seized items satisfied the Commonwealth's burden of proof. The trial court explained that,

> The significance of the items seized and their location on the premises was clear. Rice paper, betting slips, tally sheets, football pools, are all tools of the trade. When found in close proximity, under

---

**16.** Appellant also testified to her operation of the Golden Nugget. She introduced her tax returns for the Golden Nugget which indicated that she made $7,193 in 1997; $12,839 in 1998; $39,415 in 1999; $29,133 in 2000; and $30,024 in 2001. The tax returns indicated that the cost of goods for the store were $2014 in 1997; $4,531 in 1998; $15,116 in 1999; $8,454 in 2000; $6,943 in 2001. Appellant explained that she usually charged her customers double the wholesale price that she paid for the jewelry. Appellant explained that she maintained a checking account for her business but paid her vendors with cash or a credit card and paid other expenses with cash through a check-cashing agency. Appellant recorded her purchases by giving the receipts to her accountant.

**17.** Although the trial court ordered the forfeiture of $16,359, which is the $16,350 found loose in the safe plus the nine dollars found in an envelope in the safe, Appellant is only requesting the return of $16,350.

circumstances where known bookmakers are communicating, 'laying off' and '[h]edging' bets, these items are derivative contraband. Testimony established that the Golden Nugget was physically divided into a 'bookmaking' area and a 'jewelry store' area. The jewelry display case was separated from the desk, safe and shelves where evidence of the bookmaking operation was found, by a work counter. The safe next to the desk contained $16,350.00 and a tally sheet. Betting sheets were found in and under the desk, with rice paper within arm's reach. Location and proximity of both the items and money seized was significant, as evidenced by the fact that the return of those monies seized from the legitimate 'jewelry store' area of the premises was ordered.

Trial Court Opinion at 13.

By contrast, the trial court found that Appellant did not meet her burden of proving lawful ownership, acquisition or use of the $16,350. The only evidence she presented was her testimony, which the trial court found to be "inconsistent and not credible." *Id.* at 15. As a result, the trial court concluded that the "money and paraphernalia located in the 'bookmaking area' of the store was the property of Louis Longo, that it was an integral part of his bookmaking operation." *Id.*

 Finally, the trial court rejected Appellant's argument that the Commonwealth's failure to comply with Pa. R.Crim. P. 211(D) violated her constitutional rights [18] or entitled her to the return of her property. The trial court reasoned that,

While [Appellant] may have been denied access to the contents of the affidavit until February 29, 2001 we cannot find, on the facts before us that the Commonwealth's failure to file the affidavit, was 'reprehensible' and warrants suppression. Further, [Appellant] has suffered no 'prejudice' resulting from the rule violations. [Appellant] filed her motion for return of property, proceeded on that motion, obtained a copy of the affidavit before hearings commenced on the matter, and in fact used the affidavit in her cross-examination of a Commonwealth witness. There has never been an allegation that the warrant issued on less than probable cause or that the warrant was constitutionally inadequate in any other respect.

Trial Court Opinion at 9–10. The trial court further explained

Likewise, there is no prohibition against the *nunc pro tunc* filing of motions for an extension of time. Where a violation of the provisions of Rule 211 is claimed . . . a motion to make the affidavit available or a motion seeking rescission of an order sealing an affidavit may be filed.

*Id.* at 11. We now turn to the merits of Appellant's appeal.[19]

### DERIVATIVE CONTRABAND

Appellant first contends that the Commonwealth did not meet its burden of proving that the money taken from the Golden Nugget was derivative contraband

**18.** She asserted that under the Fourth Amendment, she was entitled to have the Commonwealth's evidence suppressed. The exclusionary rule requires the exclusion of evidence in matters appearing before the courts when the evidence is obtained as a result of an unlawful search and seizure. *Commonwealth v. Johnson,* 474 Pa. 512, 379 A.2d 72 (1977).

**19.** The trial court has the discretion to grant or deny a petition for forfeiture. Absent an abuse of that discretion, we will not reverse the trial court. *Brown v. Commonwealth,* 140 Pa.Cmwlth. 579, 594 A.2d 806 (1991).

because there is no direct evidence that the money was an integral part of the gambling operation. Thus, the trial court erred in granting the Commonwealth's forfeiture petition with respect to the $16,350.

The procedure to be applied in a gambling forfeiture case is set forth in Section 602(e) of the Liquor Code, 47 P.S. § 6–602(e); *Commonwealth v. McDermond,* 127 Pa.Cmwlth. 17, 560 A.2d 901 (1989). Section 602(e) provides that the Commonwealth must prove by preponderance of the evidence [20] that the property was unlawfully possessed or used. Once the Commonwealth makes this showing, the burden shifts to the claimant to establish (1) that she is the owner of the property; (2) that she lawfully acquired the same; and (3) that the property was not unlawfully used or possessed. 47 P.S. § 6–602(e).

■■■ Cash may be forfeited to the Commonwealth as derivative contraband of an illegal gambling operation. *Petition of District Attorney of Wyoming County Seeking Forfeiture of One 1986 Oldsmobile Sedan,* 165 Pa.Cmwlth. 61, 644 A.2d 240, 243–244 (1994). Cash will be found derivative contraband of an illegal gambling operation where

> *it is clearly apparent that the money formed an integral part of the illegal gambling operation* and, being commingled with other such money, had not previous to the seizure been reclaimed

and taken back into possession of the player nor been received and reduced to the exclusive possession of the winner or owner of the gambling device, or proprietor of the gambling establishment.

*Id.* at 244 (citing *McDermond*) (emphasis added); *Fairmount Engine Co. v. Montgomery County,* 135 Pa.Super. 367, 5 A.2d 419, 420–421 (Pa.Super.1939).

Appellant contends that for the Commonwealth to meet its burden of proving that the money was "an integral part of the illegal gambling operation" it must produce direct evidence showing that the money was "actually in [sic] engaged in the gambling operation, *Com. v. Bretz,* 289 Pa.Super. 259, 433 A.2d 55 (1981), or so earmarked or segregated as to be identified therewith. *In Re: $13,561.50,* 72 Pa. Cmwlth. 451, 456 A.2d 1140 (1983)." Appellant's Brief at 16–17. However, in *McDermond,* this Court rejected this argument.[21]

In *McDermond,* the police conducted a ten-day investigation of an apartment suspected to be used for illegal bookmaking and then obtained a search warrant. When the police arrived at the apartment to execute the search warrant, they found McDermond leaving the building carrying a small cardboard box. McDermond got into his car and placed the box on the car seat next to him, but an officer stopped

---

**20.** The preponderance of the evidence standard was explained by this Court in *Commonwealth v. McJett,* 811 A.2d 104, 110 (Pa. Cmwlth.2002) (citations omitted) which provides,

> Preponderance of the evidence is tantamount to a "more likely than not standard." ... Proof by a preponderance of the evidence is "often alluded to as a weighing of the evidence and a determination based upon which way the mythical scales are tipped."

**21.** Further, the cases relied on by Appellant are distinguishable. In *Commonwealth v.*

*Bretz,* 289 Pa.Super. 259, 433 A.2d 55 (1981), the Commonwealth admitted that the money it forfeited from the slot machines was not used in a gambling operation and in *In re $13,561.50,* 72 Pa.Cmwlth. 451, 456 A.2d 1140 (1983), the money was taken directly from a blackjack table, crap table, and a big six wheel and thus the connection was more direct than in this case. As noted above, this Court's decision in *Commonwealth v. McDermond,* 127 Pa.Cmwlth. 17, 560 A.2d 901 (1989) applies here.

McDermond before he could pull away. A search of the box revealed, in part, thousands of illegal lottery, sports and horse wagers and corresponding tally sheets. A search of McDermond's person uncovered $4225 from his front pocket and $5000 from his back pocket and an apartment key. Using the apartment key, the police searched the apartment and found additional gambling paraphernalia similar to that found in the box.

The Commonwealth filed a petition for forfeiture of the $9225 found in McDermond's pockets, which the trial court denied. The trial court reasoned that although the police established that a gambling operation was occurring at the apartment, it failed to establish the "essential connection" of the confiscated money to the illegal operation.

■ This Court reversed, concluding that the preponderance of the evidence showed that the seized money was derived from gambling transactions and that it constituted either a reserve from which winners were paid or profits from the operation. The Commonwealth did not produce "direct empirical evidence" connecting the money to the operation, but we reasoned that "we do not believe that money must be labeled 'gambling money' before it can be forfeited along with other gambling paraphernalia." *McDermond,* 560 A.2d at 905. We explained that:

> [f]ollowing two weeks of surveillance, appellee was apprehended leaving a bookmaking operation while carrying a veritable plethora of tally sheets and wagering slips with his pockets literally

bulging with cash. *The Commonwealth's evidence, both direct and circumstantial, would certainly support a conclusion that the money was an integral part of the illegal gambling operation.*

*Id.* (emphasis added). Stated otherwise, circumstantial evidence may be presented to show that cash was derivative contraband of illegal gambling.

■ Here, Patton stated that he was involved in bookmaking activities with Longo; that he understood the Golden Nugget to be Longo's base of operation for the gambling enterprise; and that he often went to the store to pick up or drop off money related to the gambling business. Troopers McBraiarty and Thompson testified that the police intercepted several telephone conversations between Louis and Longo to and from the store that involved gambling. The search revealed the section of the store devoted to the gambling enterprise, *i.e.*, the area comprised of the safe, desk and shelf behind the work counter because of the gambling paraphernalia found there. On the desk were tablets and pads, a telephone, a football magazine and betting slips. Under the desk, were bet sheets dated October 30 and 31. In a desk drawer were football pools. Next to the desk, within arm's reach, were the shelves wherein the police seized rice paper.

Most notably, in the safe next to the desk was found $16,350 along with a tally sheet, which is an item of gambling paraphernalia.[22] Trooper Thompson testified

---

22. At oral argument, Appellant's counsel contended that there is no evidence in the record showing what was on the tally sheet and that there could have been a list of the jewelry purchases that Appellant planned to make. The tally sheet was not admitted into evidence for inspection. Thus, the trial court should not have relied on it.

However, Trooper Thompson testified that the police found it in the safe with the $16,350 and that tally sheets are considered gambling paraphernalia. Further, caselaw supports his position. *See Commonwealth v. Perry,* 254 Pa.Super. 549, 386 A.2d 86 (1978); *Sugalski v. Cochran,* 365 Pa.Super. 370, 529 A.2d 1104 (1987) (recognizing that a tally

that large amounts of money are often found at the scene of a gambling operation to allow for payout. Although the $16,350 was not divided into denominations, as is typical in gambling operations, Trooper Thompson surmised that "from the time period that we were there, the days, sporting events have not started there wasn't people that had won or lost" and that the money "was there maybe ready to be taken out for payout later that evening." R.R. 100–101.

Appellant contends that the proximity of the gambling paraphernalia to the money is circumstantial evidence that did not prove that the cash was derivative contraband. Appellant notes that "[t]he statutory rebuttable presumption of contraband status for cash seized in close proximity is limited to controlled substances only. See 42 Pa.C.S. 6801(a)(6)(ii)." [23] Appellant's Brief at 17. She argues that the trial court used a statutory presumption that has no application in a gambling case.

■■■ We disagree that the trial court reached its conclusion by using the statutory presumption for a forfeiture in a controlled substance case.[24] In such cases, if the Commonwealth produces evidence showing that cash was found in close proximity to controlled substances, then the court *must* presume that the money was proceeds derived from the sale of a controlled substance. This finding can only be set aside if the defendant puts forth evidence showing that the money came from another source and persuades the court of that fact. 42 Pa.C.S. § 6801(a)(6)(ii).

■■■ By contrast, here, the trial court found that the $16,350 was an integral part of the gambling operation by making inferences from the evidence produced by the Commonwealth. An inference *allows but does not require* the factfinder to infer the elemental fact from the evidence and places no burden of persuasion or production on the defendant. *MacPherson* 561 Pa. at 581, 752 A.2d at 389. The trial court drew its inference from the circumstantial and direct evidence produced by the Commonwealth that included: the ongoing bookmaking operation at the store; proximity of the money to the gambling paraphernalia; the tally sheet found in the safe with the $16,350; the bid sheets dated October 30 and 31; and Trooper Thomp-

sheet is considered gambling paraphernalia). Once the Commonwealth put forth this evidence, the burden shifted to Appellant to rebut it. However, Appellant offered no rebuttal evidence on this point. Appellant could have subpoenaed the tally sheet itself and place it into evidence; she did not. Thus, her argument lacks merit.

**23.** 42 Pa.C.S. § 6801(a)(6)(ii)(emphasis added) provides,

No property shall be forfeited under this paragraph, to the extent of the interest of an owner, by reason of any act or omission established by the owner to have been committed or omitted without the knowledge or consent of that owner. *Such money and negotiable instruments found in close proximity to controlled substances* possessed in violation of The Controlled Substance,

Drug, Device and Cosmetic Act *shall be rebuttably presumed to be proceeds derived from the selling of a controlled substance* in violation of The Controlled Substance, Drug, Device and Cosmetic Act.

**24.** A presumption tells the fact finder that he *must* find the elemental fact upon proof of the basic fact. *Commonwealth v. MacPherson*, 561 Pa. 571, 582, 752 A.2d 384, 389 (2000); 8 Standard Pennsylvania Practice 2d § 49:70. A *presumption is* either rebuttable or conclusive. A rebuttable presumption requires the fact finder to find the presumed element if the basic fact is proven, unless the defendant comes forward with some evidence to rebut the presumed connection between the two facts. *MacPherson*, 561 Pa. at 582, 752 A.2d at 390. If the defendant satisfies this burden of production; the ultimate burden of persuasion returns to the prosecution. *Id.*

son's testimony that the money was not sorted into denominations because the games had not yet occurred and Longo was not ready for payout. These facts support the trial court's inference.

In short, we disagree with Appellant that the Commonwealth failed to meet its burden by a preponderance of the evidence. *McDermond* established that circumstantial and direct evidence may be used to satisfy the Commonwealth's burden. It was not necessary for the Commonwealth to produce, for example, a post-it note attached to the cash imprinted with the words "gambling money." The direct evidence shows that the funds were found at the heart of the gambling operation in the store.

█ Once the Commonwealth met its evidentiary burden, it became Appellant's burden to refute the Commonwealth's case. Appellant testified that the "money in the safe was her money, comprised mostly of the settlement proceeds, store profits and gifts from her father, and that she was planning to use the money to purchase stock for the upcoming Christmas season." Appellant's Brief at 19. However, the trial court did not find Appellant's testimony credible. The credibility of witnesses and the weight to be accorded to the evidence produced are matters within the province of the fact finder, who is free to believe all, some or none of the evidence. *Commonwealth v. McCalman*, 795 A.2d 412, 415 (Pa.Super.2002); *Commonwealth v. Tate*, 485 Pa. 180, 182, 401 A.2d 353, 354 (1979). Because Appellant did not produce any other evidence to support her argument, the trial court held that she failed to

meet her burden of proving that she lawfully acquired, owned and used the $16,350. To disturb this conclusion would require this Court to set aside the trial court's credibility determination; this we cannot do.

## AFFIDAVIT

Appellant next contends that the police violated her constitutional rights when the police failed to file the affidavit with the clerk of the Delaware County trial court and by filing a *nunc pro tunc* request for a continuation of the sealing order. Appellant argues that as a result of these violations, she is entitled to a return of her property.

The purpose of the affidavit is to establish probable cause to obtain a search warrant. Pa. R.Crim. P. 203(A)-(B). The affidavit is signed and sworn before an issuing authority[25] and includes information such as: the name and address of the affiant; the items or property to be searched for and seized; the person or place to be searched; the owner of the place to be searched; the crime which has or is being committed; and the facts and circumstances which form the basis for the affiant's conclusion that there is probable cause to justify the search. Pa. R.Crim. P. 206. The issuing authority must rely solely on the information contained in the affidavit when determining whether probable cause exists to conduct the search. Pa. R.Crim. P. 203(B).

█ If probable cause is found, the search warrant is issued and executed. The police officer executing the warrant

---

**25.** Pa. R.Crim. P. 200 provides that a search warrant may be issued by any issuing authority within the judicial district wherein is located either the person or place to be searched. The rule "formally authorizes district justices, Philadelphia bail commissioners, and judges of the Municipal, Common Pleas, Commonwealth, Superior, and Supreme Courts to issue search warrants." Pa. R.Crim. P. 200, *comment.*

must inventory the items seized [26] in the presence of the property owner from whom the property was taken. The inventory must be returned to and filed with the issuing authority, which can then ensure that all of the items seized are accounted for in the return. Pa. R.Crim. P. 209(A), *comment.*[27] A copy of the search warrant, affidavit and inventory are left with the person in charge of the premises subject to the search.

In limited cases, the affidavit may be sealed. Pa. R.Crim. P. 211. An affidavit is sealed in cases where there is an ongoing investigation [28] and the police want to ensure that the investigation is not jeopardized by revealing the information contained in the affidavit too soon. Pa. R.Crim. P. 211, *comment.* In these circumstances, the affidavit under seal is not delivered to the subject of the search upon completion of the search.

Pennsylvania Rule of Criminal Procedure 211 sets forth the procedure to seal an affidavit. It provides, in relevant part, that:

(A) At the request of the attorney for the Commonwealth, a search warrant affidavit may be sealed upon good cause shown.

\* \* \* \* \* \*

(C) When the justice or judge issues the search warrant and seals the search warrant affidavit(s), he or she shall also certify on the face of the warrant that for good cause shown the affidavit(s) is sealed and shall state the length of time the affidavit(s) will be sealed.

(D) When the search warrant is issued, *the sealed affidavit(s) shall be filed with the clerk of courts in the judicial district in which the search warrant is to be executed.*

(E) The affidavit shall be sealed for a period of not more than 60 days, unless the time period is extended as provided in paragraph (F) or paragraph (G).

(F) *Upon motion of the attorney for the Commonwealth for good cause shown, the justice or judge who issued the search warrant may extend the period of time that the affidavit(s) will remain sealed.* If the justice or judge is unavailable, another justice or judge shall be assigned to decide the motion.

(G) Upon motion for good cause shown, the justice or judge may grant an unlimited number of extensions of the time that the affidavit(s) shall remain sealed. Each extension shall be for a period of not more than 30 days.

Pa. R.Crim. P. 211 (emphasis added). We now turn to the present case.

---

**26.** The inventory of items seized is separate from the receipt of property left with the property owner. *See* Pa. R.Crim. P. 209, *comment.*

**27.** In her brief to this Court, Appellant contends that the police erred because no return had been made to the Superior Court. By using this language it appears as though Appellant is also alleging that the police violated Pa. R.Crim. P. 209(C) which provides that "the return shall be made to the justice or judge who issued the warrant." The return refers to the list of the inventory of items seized during the search and it must be filed with the Court to ensure that "all items seized are accounted for in the return to the issuing authority." Pa. R.Crim. P. 209(C), *comment.* However, Appellant did not set forth this particular issue in her Matters Complained of on Appeal nor did the trial court address this issue. Thus, to the extent that Appellant may be trying to raise this issue on appeal, it is waived.

**28.** Generally, an affidavit is sealed in cases where the police are using electronic surveillance or an undercover agent.

■ Appellant correctly asserts that the affidavit was not filed with the trial court [29] or with the Superior Court as required by Rule 211(D). However, the comment to Rule 211 provides that the judge or justice has discretion as to when to file the affidavit and can choose to file it with a clerk in another judicial district. Pa. R.Crim. P. 211, *comment.*[30] Notably, Rule 211 does not provide for sanctions in the event its terms are not satisfied. Further, Appellant has not alleged any harm resulting from this violation of Rule 211.

Here, the Commonwealth requested and obtained a *nunc pro tunc* extension of the sealing order thirty-four days after the initial order expired. Rule 211(F) does not provide a time frame for when the Commonwealth must request an extension of the initial sealing order, only that extensions will be considered "upon motion of the attorney for the Commonwealth." Pa. R.Crim. P. 211(F). Stated otherwise, it does not bar a *nunc pro tunc* extension request.

Further, Appellant was not prejudiced by the Superior Court's order extending the sealing of the affidavit to February 29, 2000. Although Appellant initially filed her motion for return of property on February 1, 2000, she later withdrew her motion and then renewed it on October 31, 2001. By the first day of hearing on her motion for return of property, on March 15, 2003, she had the affidavit.[31] Indeed, Appellant used the affidavit when she cross-examined Trooper McBraiarty.

Appellant contends that these detours from Rule 211 violated her constitutional rights and, thus, she is entitled to the return of the $16,350. In support, Appellant directs us to the holdings in *One 1958 Plymouth Sedan v. Commonwealth of Pennsylvania,* 380 U.S. 693, 85 S.Ct. 1246, 14 L.Ed.2d 170 (1965)[32] and *Commonwealth v. Anthony,* 418 Pa.Super. 82, 613

---

**29.** Appellant attributes error to "the actions of law enforcement agents" in failing to file the sealed affidavit. However, according to Pa. R.Crim. P. 211, it is not the police who file the affidavit but the judge who issues the search warrant and sealing order.

**30.** The comment to Rule 211 provides that:
Unless the justice or judge orders otherwise, paragraph (D) requires that when the search warrant is issued the sealed affidavit(s) must be filed with the clerk of courts in the judicial district in which the search is expected to be conducted. *There may be cases in which the justice or judge might determine, for example, that it is better to retain the sealed affidavit(s) in his or her office until a later time, such as when the return is made, and would therefore not file the sealed affidavit(s) until after this occurs, or that the affidavit(s) should be filed with a clerk in a different judicial district.*
Pa. R.Crim. P. 211, *comment* (emphasis added).

**31.** The comment to Rule 211 provides that,
When determining whether there is good cause to extend the time that the affidavit(s) is to remain sealed or the time before a copy of the affidavit(s) is given to the defendant, in addition to examining the Commonwealth's or the defendant's need to have the affidavit sealed, the justice or judge should consider any pertinent information about the case, such as whether any items were seized, whether there were any arrests, and whether any motions were filed. *The justice or judge should also consider the defendant's need to have the affidavit(s) to prepare his or her case, especially the right to file motions, including a motion to suppress or a motion for return of property.*
Pa. R.Crim. P. 211, comment (emphasis added).

**32.** In *One 1958 Plymouth Sedan,* the Court held that evidence seized in the course of an automobile search without a written warrant, unless the search was sustained by probable cause, could not be used in a proceeding for forfeiture of an automobile which had allegedly been used in illegal transportation of intoxicating liquors but was not *per se* contraband.

A.2d 581 (1992).[33]

■ However, these cases are inapposite because they involved searches without probable cause that required the exclusion of tainted evidence from a criminal prosecution. A violation of technical rules governing a search warrant does not render a search warrant unreasonable nor require the exclusion of evidence. Only a violation which assumes constitutional dimensions, or substantially prejudices the accused, may require the exclusion of evidence so seized. *Commonwealth v. Mason*, 507 Pa. 396, 406–407, 490 A.2d 421, 426 (1985). Here, Appellant is not challenging the issuance or execution of the search warrant nor is she seeking the exclusion of evidence from a criminal proceeding against her.

It is true that the technical requirements with respect to the affidavit were not followed, but this did not render the search unreasonable. The overriding point is that Appellant was able to use the affidavit at the hearing on her motion to have the property returned; accordingly, her constitutional right to a fair hearing was not impaired. To order the return of property because Rule 211 was not strictly followed, would require this Court to craft a sanction when none has been provided in Rule 211(D). We decline to do so.

## CONCLUSION

We hold that the trial court did not abuse its discretion in holding that the Commonwealth met its burden of proving by a preponderance of the evidence that the $16,350 found in the safe was derivative contraband. Appellant, however, did not meet her burden of proving that the $16,350 was lawfully owned, acquired, used or possessed because the only evidence that she put forth was her testimony, which the trial court did not find credible. The Commonwealth's failure to comply with Pennsylvania Rule of Criminal Procedure 211 does not entitle Appellant to a return of the $16,350. She had the affidavit at the point in time she needed *i.e.*, the hearing on the forfeiture.

For these reasons, the order of the trial court is affirmed.

Judge SMITH–RIBNER dissents.

## ORDER

AND NOW, this 29th day of July, 2004 the order of the Court of Common Pleas of Delaware County dated October 20, 2003 in the above captioned matter is hereby affirmed.

---

**33.** In *Anthony*, the defendant filed a petition for the return of property confiscated in a raid on an alleged gambling operation. The municipal court concluded that the seizure of the derivative contraband was illegal because the warrant failed to establish probable cause for the search, thus, the exclusionary rule applied. The defendant then filed a petition for return of the property with the trial court which concluded that it was bound by the municipal court's ruling excluding the evidence; thus, the trial court ordered the property returned. This Court reversed the trial court's holding reasoning that because the trial court is authorized to serve in an appellate capacity over the municipal court it was appropriate for the trial court to determine the validity of the municipal court's ruling regarding whether the search was properly conducted. Thus, the Court remanded the case to the trial court for a hearing on the matter.